**Ladislaus VON HOFFMANN and Beatrix Von Hoffmann, Trustee under 1987 Von Hoffmann Insurance Trust and 1987 Von Hoffmann Trust II, Plaintiffs,**

v.

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA and Alexander & Alexander, Inc., Defendants.**

No. 97 Civ. 4496(DC).

United States District Court, S.D. New York.

May 21, 2002.

---

Mintz Levin Cohn Ferris Glovsky and Popeo PC, By: Robert I. Bodian, David L. Barres, New York, New York, for Plaintiffs.

Mound, Cotton, Wollan & Greengrass, Alexander & Alexander, Inc., By: Renee M. Plessner, New York, New York, for Defendant.

**OPINION**

CHIN, District Judge.

In 1987, plaintiff Ladislaus Von Hoffmann ("Von Hoffmann") purchased $30 million worth of "vanishing premium" life insurance from defendant The Prudential Insurance Company of America ("Prudential"). Defendant Alexander & Alexander, Inc. ("A & A") was the broker. Premiums were to "vanish" after seven years because the first seven years worth of premiums were expected to generate sufficient dividends to eliminate the need for Von Hoffmann to pay any further premiums. Prudential and A & A were careful to provide disclaimers; they advised Von Hoffmann that the seven-year premium feature was based on expected investment returns and that they could not guarantee future performance. They specifically noted that if investments did not perform as predicted, additional premiums would be required. They provided illustrations to show how the process would work, and represented that actual dividends paid on life insurance policies had exceeded the illustrated dividends for the prior twenty years.

In fact, the premiums did not "vanish" after seven years, and to date the cost of the policies has exceeded the originally projected premiums by more than $3.3 million. Von Hoffmann and his wife, Beatrix Von Hoffmann (the "Von Hoffmanns"), brought this action for, *inter alia,* common law fraud, alleging that Prudential and A & A engaged in a scheme of marketing fraud. The Von Hoffmanns' claims against Prudential have been settled, but plaintiffs' claims against A & A remain. A & A moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing plaintiffs' claims for common law fraud, negligent misrepresentation, negligence, and violation of New York Insurance Law § 2123. A & A also moves to dismiss Prudential's

cross-claims for indemnification and contribution as moot.

Although certain of the Von Hoffmanns' claims are time-barred and must be dismissed, their principal claims, including the claim of fraud, survive, for a reasonable jury could find that A & A failed to disclose a critical fact—Prudential had changed its methodology for calculating dividends, and thus the twenty-year history of dividends touted by A & A and Prudential was no longer applicable. Although A & A and Prudential had provided certain disclaimers, including a statement that future dividend rates could not be guaranteed, a reasonable jury could surely find that the failure to disclose the change in methodology constituted a material omission. Accordingly, A & A's motion for summary judgment is granted in part and denied in part. A & A motion to dismiss Prudential's cross-claims for indemnification and contribution is granted, as it has not been opposed.

## BACKGROUND

### A. *Facts*

The facts set forth below are drawn from the parties' motion papers and supporting materials, and are construed in the light most favorable to the Von Hoffmanns for purposes of this motion.

In 1986, Von Hoffmann sold one of his businesses, Omicron Holdings, Inc., which carried three life insurance policies on his life totaling $50,000,000. (Von Hoffmann Decl. ¶ 2). In deciding what to do with the policies once the business was sold, Von Hoffmann had his company's controller, Albert Lopez, consult with A & A, the insurance broker Von Hoffmann had relied

on since 1977. (*Id.* ¶¶ 1–3). Under this arrangement, Von Hoffmann retained authority over whether to purchase a policy, and Lopez relayed any information or documents he received from A & A to Von Hoffmann. (*Id.* ¶ 3).

Concerned with cost, Von Hoffmann advised A & A that he wanted to pay the premiums on any policy he purchased as quickly as possible. (*Id.* ¶ 5; Lopez Decl. ¶ 5). A & A responded that a single-premium policy was not feasible. (Von Hoffmann Decl. ¶ 5). Instead, A & A encouraged Von Hoffmann to purchase whole life policies with a "vanishing premium" or "abbreviated payment plan" option, where Von Hoffmann would make only seven cash premium payments, and after that, the premiums would "vanish" or "abbreviate." [1] (*Id.* ¶ 6; Am. Compl. ¶ 47; Lopez Decl. ¶ 6). Between December 1986 and June 1987, A & A provided "illustrations" concerning the policies, *i.e.*, written promotional material used to "illustrate" how a policy would perform, which Lopez delivered to Von Hoffmann. (Lopez Decl. ¶ 7). Von Hoffmann asserts that each illustration was accompanied by either a cover letter or fax cover sheet representing that premiums would "abbreviate" in seven years. (Von Hoffmann Decl. ¶ 8; Lopez Decl. ¶ 7).

In 1987, Von Hoffmann "question[ed A & A] about the credibility of Prudential's dividend scales," whether the illustrated dividends were likely to be paid, and if so, what the basis was for such expectation. (Pls.' 56.1 Statement ¶ 28; Von Hoffmann Decl. ¶ 10). A & A responded by letter dated June 12, 1987, enclosing a marketing brochure and other materials intended to "support the strong record of Prudential

---

1. Prudential describes this type of policy as follows: "When a policy 'abbreviates', it has reached the point where enough premiums have been paid in cash so that future projected dividends, plus those already used to purchase paid-up additional insurance, are sufficient to pay the remaining premiums on an annual mode." (Lopez Decl. Ex. 8).

over a very long period of time." (Lopez Decl. Ex. 6). These illustrations explained that the policyholder would make only seven out-of-pocket cash premium payments, and that the remaining premium payments were to be paid out of funds accumulated in the policies. (Von Hoffmann Decl. ¶ 12; Lopez Decl. ¶¶ 10, 12). In addition, they showed that Prudential's actual dividends on life insurance policies had exceeded the illustrated dividends for the previous twenty years. (Von Hoffmann Decl. ¶ 10; Lopez Decl. ¶ 13 & Ex. 6). The illustrations also stated that premium payments were required for every year of the policy, and that "Annual payments are assumed." (Von Hoffmann Decl. ¶ 12; Lopez Decl. Ex. 6). A & A did not disclose that the illustrated dividends for the twenty-year period were based on an outdated method of crediting dividends that was no longer applicable. (Pls.' Opp'n Summ. J. at 3–4). A & A did not disclose that similar results could not be expected under the new method of crediting dividends.

Von Hoffmann claims that A & A withheld information from him, including a particular five-page illustration concerning his policies. (*Id.*). Specifically, Von Hoffmann claims that even though A & A received the complete five-page illustration from Prudential, A & A always removed page five (and also erased the page numbers) before forwarding the illustrations to Von Hoffmann. (Pls.' Opp'n Summ. J. at 3; Lopez Decl ¶ 17). Page five was entitled "Explanation of the Abbreviated Payment Plan," and disclosed that cash premium payments might be required for more years than illustrated. (Pls.' Opp'n Summ. J. at 3). Von Hoffmann also claims that A & A removed page three on a number of occasions. (*Id.*). Page three stated that "Annual payments are assumed," and also, that dividend amounts are "not guarantees or estimates for the future" and illustrated dividends are "likely to change as current

interest rates change." (Lopez Decl. Ex. 6). Von Hoffmann admits that he received page three on this occasion, however, included with the illustrations attached to A & A's June 12, 1987 letter. (Pls.' 56.1 Statement ¶ 57; Lopez Decl. Ex. 6).

Based on A & A's advice, Von Hoffmann decided to convert the three life insurance policies that Omicron Holdings, Inc. had carried on his life into whole life insurance trusts for his daughters worth $30 million. (Von Hoffmann Decl. ¶ 3). The Von Hoffmanns signed the insurance applications in July of 1987 and the policies were issued in August of 1987 (*id.* ¶ 11), creating two life insurance trusts with Mrs. Von Hoffmann as trustee. (*Id.* ¶ 3). Von Hoffmann acknowledges that the front covers of both policies state that "Premiums are payable throughout the Insured's lifetime." (*Id.* ¶ 12 & Ex. 1). In addition, the policies provide that the policy and the application form the entire contract, and that modifications may only be made by a Prudential officer in writing. (Von Hoffmann Decl. Ex. 1). Von Hoffmann asserts, however, that on the applications for the policies, A & A typed "Abbreviated Payment Plan" under the section entitled "State any special request." (*Id.* ¶ 13 & Ex. 1; Lopez Decl. ¶ 16). Von Hoffmann understood this phrase as referring to the illustrations he received, which showed that annual premiums would vanish after seven premium payments were made. (Von Hoffmann Decl. ¶ 13).

On or about October 7, 1987, on request from Von Hoffmann, Prudential prepared materials for Von Hoffmann to illustrate Prudential's "projection of values for future years." (Lopez Decl. Ex. 8). The illustrations included the complete five-page illustration referred to above. (*Id.* ¶ 17 & Ex. 8). Von Hoffmann asserts that this was the first time he received the complete five-page illustration. (Pls.'

Mem. Opp'n Summ. J. at 4; Von Hoffmann Decl. ¶ 28). As mentioned above, page three explained, under the heading "Explanatory Notes," that dividend amounts are "not guarantees or estimates for the future"; illustrated dividends assume that current rates of investment earnings will continue each year into the future; and illustrated dividends are therefore "likely to change as current interest rates change." (Lopez Decl. Ex. 8). Page Five, "Explanation of the Abbreviated Payment Plan," provided: "[t]he dividends used in this illustration are based on the current scale and are not guaranteed. The possibility exists that cash premium payments may be required for more or fewer years than the period illustrated." (*Id.*). This was the first time the Von Hoffmanns saw page five.

Prudential also attached a cover letter and a form called the "Abbreviated Payment Plan Authorization" with the illustrations. (Lopez Decl. ¶ 17 & Ex. 8). The letter informed Von Hoffmann that "[b]ased on [Prudential's] projections, [the Von Hoffmanns'] policies will have the premiums 'vanish' or 'abbreviate' after seven annual payments." (Lopez Decl. Ex. 8). It also explained that the enclosed "authorization to proceed on [the Abbreviated Payment Plan] basis will be sent to the trustee when the eighth premium is due." (*Id.*). The authorization itself provided that Prudential would begin paying premiums on the policies by "surrendering paid-up additional coverage and/or withdrawing accumulated dividends" when it determined that the dividends would be sufficient to pay future premiums. (*Id.*). It also stated that continuation of the present rates "is *not* guaranteed...." (*Id.*). Finally, the authorization explained that if Prudential determined that dividend accumulation and the cash value of paid-up additional coverage were not sufficient to pay a premium when due, the agreement

would end. (*Id.*). Lopez states that he asked A & A about the meaning and effect of the explanatory notes and authorization form, and that A & A assured him that these items were "boilerplate," *i.e.*, automatically generated whenever a policy was issued. (*Id.* ¶ 17). Lopez reported this information to Von Hoffmann. (*Id.*).

On or about January 8, 1992, A & A first informed Von Hoffmann, in writing, that ten premium cash payments would be required on his policy instead of seven. (Von Hoffmann Decl. ¶ 14; Lopez Decl. ¶ 21 & Ex. 10). Von Hoffmann requested an explanation. (Von Hoffmann Decl. ¶ 14). By letter dated February 5, 1992, Prudential provided detailed information regarding the major elements of the dividend formula, as well as information concerning "the recent dividend changes." (Defs.' 56.1 Statement Ex. 19). In his letter to A & A of March 4, 1992, Von Hoffmann acknowledged receipt of this information, and posed additional questions concerning whether to continue his payments under the policies. (*Id.* Ex. 20). Von Hoffmann also requested a meeting with a representative from Prudential, and on April 24, 1992, Jim Avery met with Von Hoffmann in his home. (Von Hoffmann Decl. ¶ 17).

Avery testified that, at the meeting, Von Hoffmann asked numerous questions regarding "why dividends had done what they had done on his policy" and that "[h]e wanted to understand the investment generation method." (Avery Dep. 46:5–8). Avery also testified that he and Von Hoffmann "went through tremendous detailed conversations about dividends, dividend determination, how to view this, investment generation, company policy, who determines dividends." (*Id.* at 47:12–17). Avery stated that Von Hoffmann "quite frankly, drilled me for two and a half hours nonstop." (*Id.*).

Von Hoffmann admits he understood that the exact amount of future dividends was not guaranteed, and that interest rates in the economy were not guaranteed. (Pls.' 56.1 Statement ¶ 54). He claims that he believed, however, that the illustrated dividends for his policy were "actuarially sound," which he based, in part, on Prudential's history of paying high dividends. (*Id.*). He also admits that he "may have suspected there was a risk that more than seven cash payments might be needed." (*Id.* ¶ 55). He claims that he did not know, however, that the dividend payments could decrease to the extent that the abbreviated payment plan could not be sustained. (Von Hoffmann Decl. ¶ 9). He also claims that A & A did not inform him that Prudential had recently changed its method of calculating dividends to a new method that was much more volatile. (*Id.* ¶ 10). He also contends that Prudential and A & A refused to provide specific information as to how Prudential credited dividends to its policies and A & A and Prudential also did not explain the differences between the new and old methods for crediting dividends or their effect on the dividend illustrations. (*Id.* ¶¶ 15–16).

From 1992 through 1995, Lopez and Von Hoffmann exchanged correspondence with A & A and Prudential, whereby Von Hoffmann sought further explanation as to why his policies did not abbreviate. (*Id.* ¶ 19). He states that he received little information in response. (*Id.*). In the summer of 1996, Von Hoffmann received a copy of a report entitled "The Multi-state Life Insurance Task Force and Multi–State Market Conduct Examination of The Prudential Insurance Company of America" (the "Task Force Report"), drafted by the Examiners of The Multi-state Life Insurance Task Force From Several State Departments of Insurance and other State Regulatory Agencies. (*Id.* ¶ 20 & Ex. 2). The report revealed, among other things, that Prudential had "changed its method of allocating interest to dividends," making transactions appear more beneficial to customers. (*Id.* Ex. 2). It also reported that some of Prudential's agents had engaged in abusive sales practices. (*Id.*). Von Hoffmann claims that when he read the Task Force Report, he suspected for the first time that Prudential and A & A had committed fraud. (*Id.* ¶ 22).

## B. *Prior Proceedings*

The Von Hoffmanns filed the complaint in this action on June 18, 1997. On September 9, 1997, the case was transferred to the United States District Court for the District of New Jersey, by order of the Judicial Panel on Multidistrict Litigation. The Von Hoffmanns filed an amended complaint in the District of New Jersey on November 17, 1997. The parties engaged in discovery. On January 22, 2001, again by order of the Judicial Panel on Multidistrict Litigation, the case was remanded to this Court. On January 8, 2002, A & A filed this motion for summary judgment dismissing the first, fourth, fifth, and ninth causes of action, and dismissing the cross-claims for indemnification and contribution as moot.

## DISCUSSION

The Von Hoffmanns have asserted claims against A & A for common law fraud, negligent misrepresentation, negligence, and violation of New York Insurance Law § 2123. A & A moves for summary judgment dismissing the claims on the grounds that they are time-barred; with respect to the fraud claim, A & A argues in the alternative that the Von Hoffmanns fail to state a cause of action. I discuss the merits first and the statute of limitations defense second.

## A. *The Merits*

### 1. *Applicable Law*

 To state a claim for fraudulent inducement in an insurance context, a plaintiff must allege a misrepresentation or material omission by the defendant that induced the plaintiff to purchase the policies, as well as scienter, reliance, and injury. *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 704 N.Y.S.2d 177, 185, 725 N.E.2d 598 (1999) (*"Gaidon II"*) (citing *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763 (1995)). Claims for fraud in the inducement cannot be based on a "mere unfulfilled promissory statement," but may be grounded on a "promise made with the preconceived and undisclosed intention that the promise will not be performed." *United Safety of Am., Inc. v. Consol. Edison Co. of N.Y., Inc.*, 213 A.D.2d 283, 623 N.Y.S.2d 591, 593 (1st Dep't 1995) (citations omitted). Additionally, the elements of fraud are "narrowly defined, requiring proof by clear and convincing evidence." *Gaidon II*, 704 N.Y.S.2d at 186, 725 N.E.2d 598.[2]

### 2. *Application*

The Von Hoffmanns argue that A & A committed fraud in four respects:

 First, A & A falsely represented that premiums would "vanish" after seven years;

Second, A & A modified Prudential's sales illustrations to delete information that might have cast doubt on the seven-year schedule;

Third, A & A provided no illustrations showing longer payment periods or using lower rates; and

Fourth, A & A failed to disclose that the illustrations and representations as to twenty years of performance were based on an out-of-date method for crediting dividends—a method that was no longer applicable to the policies A & A was trying to induce the Von Hoffmanns to buy—that likely predicted more optimistic results.

Resolving all conflicts in the evidence and drawing all reasonable inferences in favor of the Von Hoffmanns, I conclude that, standing alone or together, the first, second and third alleged misrepresentations do not form a basis for a fraud claim as a matter of law, for the "vanishing premium" feature was not guaranteed. The fourth alleged misrepresentation is sufficient, however, to support a claim for fraud; considering all the evidence, I conclude that genuine issues of material fact exist as to whether A & A fraudulently withheld material information to induce the Von Hoffmanns to purchase the Prudential policies.

### (a) *Vanishing Premiums*

The Von Hoffmanns claim that A & A fraudulently induced them to purchase Prudential insurance policies based on the first, second, and third misrepresentations set forth above. In light of the New York Court of Appeals' decision in *Gaidon II*, discussed below, to the extent the fraud claim is based on these alleged mis-

---

2. A & A argues that the Von Hoffmanns may not rely on the policy illustrations as evidence of fraud because they are not part of the policies and the policies contain merger clauses. (Defs.' Mem. Supp. Summ. J. at 11). This argument is inapplicable. Under New York law, a general merger clause declaring a writing to be the entire agreement between the parties will not bar admission of parol evidence to establish fraud in the inducement of the contract. *First Nationwide Bank v. 965 Amsterdam, Inc.*, 212 A.D.2d 469, 623 N.Y.S.2d 200, 202 (1st Dep't 1995) (citing *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 717, 143 N.E.2d 906 (1957)).

representations, it fails because the Von Hoffmanns cannot establish the "threshold element" for a claim of fraud, namely, misrepresentation or material omission. *Gaidon II*, 704 N.Y.S.2d at 186, 725 N.E.2d 598.

In *Gaidon II*, the court addressed claims of fraud similar to those at issue here, arising out of the sale of "vanishing premium" life insurance policies. The plaintiffs there alleged, essentially, that they purchased their life insurance policies relying on misleading illustrations and the defendants' false representations that the premium payments on the policy would "vanish" after eight years. *Id.* at 179, 725 N.E.2d 598. They argued that the illustrations were based on dividend projections that the insurer "knew or should have known were untenable." *Id.*

The court considered the illustrations, noting that limitations accompanying each illustration disclosed: " 'Figures depending on dividends are neither estimated nor guaranteed, but are based on the [current year's] dividend scale,' " and " '[a]ctual future dividends may be higher or lower than those illustrated depending on the company's future experience.' " *Id.* at 179–80, 725 N.E.2d 598. In addition, the defendants argued that the projections were based on the "continuation of an existing state of affairs and cannot be construed or characterized as guarantees." *Id.* at 186, 725 N.E.2d 598. The court ultimately found that "[b]y stating that the illustrated dividend/interest rates are not guaranteed and that they may be higher or lower than depicted, defendants made a partial disclosure." *Id.* at 186, 725 N.E.2d 598. It also observed, however, that the defendants "failed to reveal that the illustrated vanishing dates were wholly unrealistic." *Id.* at 187, 725 N.E.2d 598. Nevertheless, the court held that the insureds had not established the misrepresentation

element required to state a claim for fraudulent inducement, and that the disclaimers were sufficient to "absolve [the defendants] of fraud." *Id.* at 186, 725 N.E.2d 598. *See also Heslin v. Metro. Life Ins. Co.*, 287 A.D.2d 113, 733 N.Y.S.2d 753, 755–56 (3d Dep't 2001) (relying on *Gaidon II* and affirming dismissal of fraud count for failure to state a claim in vanishing premium context).

In this case, as in *Gaidon II*, A & A gave the Von Hoffmanns illustrations representing that the out-of-pocket cash premiums would "vanish" after seven years. The Von Hoffmanns claim that A & A knew or should have known that their payments would not actually vanish as represented in the illustrations. As in *Gaidon II*, the illustrations here contained express disclaimers. In fact, Von Hoffmann admits that he received one such illustration *before* he purchased the policies, which stated: "Illustrated dividends on permanent policies assume that current rates of investment earnings ... will continue each year into the future. Thus illustrated dividends are likely to change as current interest rates change." (Pls.' 56.1 Statement ¶ 57; Lopez Decl. Ex. 6). Another disclaimer explicitly stated "[t]he dividends used in this illustration are based on the current scale and are not guaranteed. *The possibility exists that cash premium payments may be required for more or fewer years than the period illustrated.*" (Lopez Decl. Ex. 8) (emphasis added). Accordingly, even if A & A had removed certain pages and deleted page numbers from the illustrations before forwarding them to the Von Hoffmanns, the illustrations it did provide nevertheless contained the disclaimers just described. In light of the Court of Appeals' conclusion in *Gaidon II*, I conclude that the first, second, and third alleged misrepresenta-

tions are not sufficient to sustain plaintiffs' claim for fraud.[3]

### (b) *Material Omissions*

■ Although the Von Hoffmanns cannot reasonably argue that they were defrauded into believing the premiums were sure to vanish in seven years or that the rates would not change, a reasonable jury could conclude that A & A committed fraud by omitting material information in an effort to induce the Von Hoffmanns to purchase the policies. For example, if the Von Hoffmanns' allegations are true, A & A used Prudential's favorable twenty-year performance history to induce them to buy the policies, knowing that Prudential had changed its methodology for crediting dividends, and knowing that the information was therefore misleading. The old method—which generated the twenty years worth of favorable results—was no longer applicable, and A & A and Prudential knew that the new method would generate different results. A reasonable jury could certainly conclude that this omitted information was material, and that a reasonable investor would have wanted to know that the method used to generate the twenty years worth of results was no longer being used and that a new, perhaps less favorable method was going to be used instead.

In addition, for purposes of this motion, I assume that A & A consistently omitted certain pages from the illustrations. A reasonable jury could rely on these omissions in considering whether the failure to disclose the change in dividend methodology was material and deceitful. Although some of the information apparently was provided on one or two occasions, a reasonable jury could still conclude that the overall effect was to mislead the Von Hoffmanns. Moreover, A & A has not disputed that it earned more than $1 million in commissions on these sales; a jury could reasonably find scienter, or, an intent to defraud, from A & A's omission of material information. (Pls.' Opp'n Summ. J. at 1). Finally, the fact that the Von Hoffmanns understood that the "vanishing premium" feature was not guaranteed does not change the result. A reasonable jury could find that information concerning Prudential's change in methodology was critical to a decision whether to purchase the policies—information A & A purposefully withheld to induce the Von Hoffmanns to purchase the policies.

An issue of fact also exists as to what was discussed at the 1992 meeting. A & A points to Jim Avery's deposition testimony that suggests that the different methodologies were discussed, but Von Hoffmann has submitted sworn statements attesting to the fact that Prudential's change in methods and the ramifications thereof were not fully disclosed. For purposes of this motion, I must accept Von Hoffman's version as true.

Von Hoffmann asserts that in 1996, when he received the Task Force Report,

---

**3.** Even if the Von Hoffmanns could establish a material misrepresentation or omission in these respects, they could not establish reasonable reliance. *See, e.g., Goshen v. Mutual Life Ins. Co. of New York,* No. 600466, 95–006, at *8 (N.Y.Sup.Ct. Oct.21, 1997) (finding plaintiffs' reliance on assumption that they had right to believe, based on illustrations and representations of sales agents, that interest and dividends assumptions on which vanishing premium policies were based would not change to be "unreasonable, both based on the specific disclaimers contained in the illustrations and the accompanying documents, and upon common experience"); *see also Gaidon v. Guardian Life Ins. Co. of Am.* (*"Gaidon I"*), 255 A.D.2d 101, 679 N.Y.S.2d 611, 612 (1st Dep't 1998) ("[E]ven if [] a [fiduciary or confidential] relationship had arisen and given rise to a duty to speak accurately, plaintiffs' reliance still had to be reasonable ....") (citation omitted), *aff'd,* 96 N.Y.2d 201, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (2001).

he suspected for the first time that Prudential and A & A had committed fraud. The "Task Force" was formed by the New Jersey Insurance Commissioner in April of 1995, in response to "widespread allegations of improper sales and marketing activity of life insurers." (Von Hoffmann Decl. Ex. 2). The report states, "[i]n the wake of lawsuits and publicity about Prudential, the Task Force's first objective was to review allegations of improper sales practices regarding the company...." (*Id.*). It concluded, *inter alia*, that Prudential had "changed its method of allocating interest to dividends," making transactions appear more beneficial to customers, and that some of Prudential's agents had engaged in abusive sales practices. (*Id.*). For all these reasons, I conclude that genuine issues of material fact exist as to whether A & A fraudulently withheld material information to induce the Von Hoffmanns to purchase Prudential insurance policies.

## 2. *Statute of Limitations*

I turn now to the statute of limitations defense and I discuss the claims for (a) fraud, (b) negligent misrepresentation, and (c) negligence and violation of the Insurance Law.

### (a) *Fraud*

Under New York law, the statute of limitations for a claim of fraud is six years. N.Y. C.P.L.R. § 213(8) (McKinney 1990). In addition, C.P.L.R. § 203(a) provides that the time within which an action must be commenced "shall be computed from the time the cause of action accrued to the time the claim is interposed." Alternatively, if the limitations period is computed from the time when facts were discovered or could have been discovered with reasonable diligence, then § 203(g) requires that the action be commenced within two years after the actual or imputed discovery.

■ As a general rule, under § 203(a), a claim for fraudulent inducement in the execution of an agreement "'accrues upon the execution of the agreement,'" *i.e.*, the time the fraud was committed. *In re Estate of Blake*, 282 A.D.2d 905, 723 N.Y.S.2d 563, 564 (3d Dep't 2001) (quoting *Pommer v. Trustco Bank*, 183 A.D.2d 976, 583 N.Y.S.2d 553, 555 (3d Dep't 1992)). Here, it is undisputed that the Von Hoffmanns signed the insurance applications in July of 1987, and the policies were issued in August of 1987. The complaint in this action was filed on June 18, 1997, nearly ten years later. Hence, this claim is time-barred under § 203(a). The Von Hoffmanns argue, however, that their claim is not barred under § 203(g). They claim that they first discovered the fraud in the summer of 1996, when they received and read the Task Force Report. Because they filed the complaint in 1997, just one year later, the Von Hoffmanns argue that their claim is timely.

■ Under § 203(g), the two-year statute of limitations runs from discovery of the fraud, or from the time when facts *could have been discovered* with reasonable diligence. The Second Circuit has held that "[t]he test as to when fraud should with reasonable diligence have been discovered is an objective one." *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (citing *Warner v. Republic Steel Corp.*, 103 F.Supp. 998, 1009 (S.D.N.Y. 1952)). Where the relevant facts are not disputed, the question of when a plaintiff has inquiry notice is a question of law to be decided by the court. *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 n. 3 (2d Cir. 1993) (resolving issue of inquiry notice on motion to dismiss where facts needed to determine when reasonable investor of ordinary intelligence would have been aware

of fraud could be gleaned from the complaint and supporting documents); *see also Foxley v. Sotheby's, Inc.,* 893 F.Supp. 1224, 1231 (S.D.N.Y.1995) (same); *see also* C.P.L.R. § 203(g) Commentary ("CPLR 203(g) requires the court to determine when the cause of action actually accrued in order to apply the alternate formula.").

As noted, the Von Hoffmanns claim that they first discovered Prudential and A & A's fraud in the summer of 1996, and filed their complaint within two years of discovery, in accord with § 203(g). The facts are disputed, and on the evidence before the Court, I conclude that a reasonable jury could find that A & A's alleged fraud could not have been discovered until the summer of 1996.

First, for purposes of this motion, I assume that A & A consistently removed certain pages from the illustrations and omitted other material information regarding the potential performance of the policies. I have already concluded that a reasonable jury could find that A & A omitted this information in an effort to mislead the Von Hoffmanns, and induce them to buy the policies. It follows, therefore, that a reasonable jury could find that the Von Hoffmanns were in fact misled, and did not suspect that the policies might not perform as promised.

Second, I have also concluded that an issue of fact exists as to what was discussed at the 1992 meeting. Notwithstanding Von Hoffmann's diligence in requesting information—and even requesting a meeting—he asserts that Avery refused to provide "proprietary information" and that, in the end, Prudential's change in methodology and the ramifications thereof were not fully disclosed. Crediting Von Hoffmann's version, as I must on this motion, I conclude that a reasonable jury could find that A & A's alleged fraud could

not have been discovered, with reasonable diligence, until the summer of 1996.

**(b)** *Negligent Misrepresentation*

In New York, a claim for negligent misrepresentation based on the same facts as a claim for fraud is governed by the six-year statute of limitation for fraud under C.P.L.R. § 213(8). *Fromer v. Yogel,* 50 F.Supp.2d 227, 242 (S.D.N.Y.1999) (collecting cases, and reasoning that the six-year period for fraud applies because the claim depends on an act of misrepresentation whether negligent or intentional); *Ambassador Ins. Co. v. Euclid Servs., Inc.,* No. 80 Civ. 1235, at *4, 1984 WL 341 (S.D.N.Y. May 24, 1984) (applying § 213(8) because the "essence of the complaint" sounded in fraud even though the limitations period for negligence under § 214(4) is three years); *see also In re Argo Communications Corp.,* 134 B.R. 776, 794–96 (Bankr.S.D.N.Y.1991) (applying § 213(8) where the claim is closely aligned with a claim for intentional misrepresentation). Further, a cause of action based on negligent misrepresentation accrues "on the date of the alleged misrepresentation which is relied upon by the plaintiff." *Fandy Corp. v. Lung–Fong Chen,* 262 A.D.2d 352, 691 N.Y.S.2d 572, 573 (2d Dep't 1999) (citation omitted).

Here, the alleged negligent misrepresentation occurred in 1987, when A & A encouraged Von Hoffmann to purchase a policy with a "vanishing premium" option, provided illustrations in support of the policy, and, most significantly, omitted information as to the change in dividend methodology. (Von Hoffmann Decl. ¶ 5; Lopez Decl. Ex. 6). Von Hoffmann states that he "relied on A & A's advice," and ultimately purchased the policies in July of 1987. (Von Hoffmann Decl. ¶ 3, 11). Therefore, under § 213(8), the statute of limitations on this claim expired in 1993. Alternative-

ly, however, under § 203(g), a two-year limitations period runs from discovery of the negligent misrepresentation, or from the time when facts could have been discovered with reasonable diligence. For the reasons already stated, a reasonable jury could find that A & A's alleged misrepresentation could not have been discovered with reasonable diligence until the summer of 1996. The claim thus may be timely under § 203(g).

### (c) *Negligence and Violation of New York Insurance Law § 2123*

 In *Chase Scientific Research, Inc. v. NIA Group, Inc.,* the New York Court of Appeals held that claims against insurance agents and brokers for failure to procure adequate insurance are governed by the three-year limitations period for negligence actions under C.P.L.R. § 214(4), and the six-year period for breach of contract actions under § 213(2). 96 N.Y.2d 20, 725 N.Y.S.2d 592, 598, 749 N.E.2d 161 (2001). Here, the Von Hoffmanns assert a claim for negligence, alleging that A & A breached its duty of care to act with reasonable skill and diligence in selling Prudential's policies by failing, among other things, to disclose all material facts. (Am.Compl.¶¶ 83–84). Liability for A & A's alleged failure to disclose material facts, and the Von Hoffmanns' ability to assert a cause of action, arose in 1992, at the latest, when the Von Hoffmanns were told that ten premium payments would be required on the policy instead of seven. Accordingly, under § 214(4), this claim is time-barred.[4]

 Similarly, under § 214(2), the statute of limitations for claims based on

violation of New York Insurance Law § 2123 is also three·years. The statute begins to run at the time the false or misleading statements are made. *See Dolce v. Northwestern Mutual Life Ins. Co.,* .272 A.D.2d 432, 708 N.Y.S.2d 327, 327 (2d Dep't 2000) (computing three-year period of limitations from time policy was issued) (citing *Goldberg v. Manufacturers Life Ins. Co.,* 242 A.D.2d 175, 672 N.Y.S.2d 39, 43 (1st Dep't 1998)) (computing limitations period from time policy was purchased). Here, A & A's allegedly false and misleading statements were made in early 1987, and the policies were purchased in July and issued in August of 1987. Therefore, under § 214(2), this claim is also foreclosed.

### (i) *Equitable Tolling*

 Finally, the Von Hoffmanns argue that their claims for negligence and violation of New York Insurance Law § 2123 are timely because the applicable statutes of limitation are equitably tolled. This argument is rejected. The doctrine of equitable tolling does not apply to these state law claims, as the doctrine only tolls the statute of limitations with regard to federally created causes of action. *Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 747 F.Supp. 922, 943 (S.D.N.Y.1990) (finding federal equitable tolling doctrine inapplicable to common law negligence claim) (citing *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 553 n. 26 (S.D.N.Y.1977) (citing *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946))); *see also Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,* No. 98 Civ. 4960(MBM), 1999 WL 558141, at *4 n. 4 (S.D.N.Y. July 30, 1999) (citation omitted).

---

4. Although no claim for breach of contract has been alleged, such claim would also be time-barred under § 213(2) because the six-year period of limitations would run from the time the Von Hoffmanns received the policies.

*Santiago v. 1370 Broadway Assoc.,* 264 A.D.2d 624, 695 N.Y.S.2d 326, 327 (1st Dep't 1999) (citation omitted), *aff'd in part and modified in part,* 96 N.Y.2d 765, 725 N.Y.S.2d 599, 749 N.E.2d 168 (2001).

## CONCLUSION

For the reasons set forth above, A & A's motion to dismiss the Von Hoffmanns' claims is denied in part and granted in part; Prudential's cross-claims for indemnification and contribution are dismissed, as moot. The parties shall appear for a pre-trial conference on June 7, 2002 at 2:00 p.m.

SO ORDERED.