810 A.2d 1045

**Joseph COOPER, et al.**

v.

**BERKSHIRE LIFE INSURANCE COMPANY, et al.**

**No. 0154, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Nov. 14, 2002.

Martin H. Schreiber, II (Daniel F. Goldstein and Brown, Goldstein & Levy, LLP, on the brief), Baltimore, for appellants.

David W. Erb (Barrett W. Freedlander, Saul, Ewing, Weinberg & Green, Baltimore, and Gina Cinelli Birchall, Pittsfield, MA, on the brief), for Berkshire Life Ins. Co.

(Mary M. Dimaio and Maher & Associates, Towson, on the brief), for Bernard Fish.

James R. Schraf and Lipshultz and Hone, Silver Spring, on the brief, for Thomas Steinhardt.

Argued before ADKINS, GREENE and JOHN J. BISHOP, JR., (Retired, specially assigned) JJ.

## ON MOTION FOR RECONSIDERATION

ADKINS, Judge.

In 1990, Joseph Cooper ("Cooper"), one of the plaintiffs and appellant here, purchased from Berkshire Life Insurance Company ("Berkshire"), one of the appellees, two "vanishing premium" life insurance polices insuring the lives of himself and his wife Annette Cooper. He did so, he asserts, on the basis of misrepresentations by two insurance agents, Thomas Steinhardt and Bernard Fish, also appellees, that he only would have to pay premiums for ten years. Cooper donated one of the policies to the Associated Jewish Charities of Baltimore ("Associated"), and the other to The Joseph & Annette Cooper 1990 Insurance Trust (the "Trust").

After later finding out that the policies required premium payments for at least seventeen years, Cooper, joined by his wife, Associated, and the Trust (collectively, the "Coopers"), filed a complaint against Berkshire, Steinhardt, and Fish. As amended, the complaint alleges fraud (Count One), fraudulent concealment (Count Two), negligent misrepresentation (Count Three), breach of contract (Count Four), imposition of constructive trust (Count Five), Declaratory and Injunctive Relief (Count Six), reformation (Count Seven), and violation of the Massachusetts Consumer Protection Statute (Count Eight). After discovery, the defendants filed motions for summary judgment, which ultimately were granted by the trial court.

In their timely appeal, the Coopers raise the following questions, which we have re-phrased and re-ordered:

I. Is there a question of fact whether Berkshire's policies—with "disappearing premium illustrations" attached inside—were so clear that Cooper could not reasonably have relied on the premium illustrations in making his decision to purchase?

II. Does the economic loss doctrine bar the Coopers' tort claims?

III. Is there a question of fact whether Berkshire's policies—with "disappearing premium illustrations" attached inside—were so clear that the Coopers should have known of their claims when they received the policies?

As to issues I and III, we conclude that there are disputed issues of fact material to some of the Coopers' theories of recovery. As to Issue II, we conclude that the economic loss doctrine does not bar the Coopers' claims. Accordingly, we reverse the judgment of the trial court.

## FACTS AND LEGAL PROCEEDINGS

Because this case was decided on a motion for summary judgment, we derive the facts from the complaint, the affidavits, and the deposition transcripts that were part of the summary judgment record, drawing all factual inferences in favor of the Coopers, as the losing parties below.

### The Policies

Cooper, on the advice of his estate planning attorney, decided to purchase a $1 million second-to-die life insurance policy for himself and his wife, which he planned to donate to a trust that would pay estate taxes for his heirs. A second-to-die policy is one that does not pay the death benefit until both insureds have died.

Cooper informed Steinhardt and Fish (sometimes referred to as the "insurance agents"), whom he had known for many years, and considered to be trustworthy friends, about his interest in purchasing life insurance. The insurance agents told Cooper that they were "highly skilled insurance experts" who understood complex insurance projects, and encouraged him "to rely on their expertise and prior relationship of trust in choosing a policy." Steinhardt and Fish recommended a $1 million Berkshire "disappearing premium" policy, and told Cooper he would have to pay the annual $9,000 premium for nine years. "Neither Steinhardt nor Fish showed [Cooper] a

'Supplemental Footnote Page' or anything else that indicated the disappear-year was not guaranteed." To the contrary, they specifically told him that he would "not have to pay any premiums beyond the illustrated disappear-year." The Coopers were unsophisticated regarding life insurance, and unfamiliar with the technical language of the policies.

Fish and Steinhardt also showed Cooper the first page of a computer-generated "disappearing premium" sales illustration, ("Illustration I"), which demonstrated that a $1 million policy would cost only $9,000 a year for nine years. It displayed columns showing the "Scheduled Annual Outlay" for each year, as well as the "Dividend End of Prior Yr." The "Scheduled Annual Outlay" column showed $9,000 for each of the first nine years, and "0" for years ten through thirty.

On this illustration, at the bottom of the page, appeared the words: "This illustration is not complete without the accompanying Supplemental Footnote Page." At the top of the page, the illustration said: "Dividends applied to purchase paid up additions."

Cooper found the Berkshire "disappearing policy" satisfactory. Indeed, he acknowledged that he thought it was "too good to be true," and decided to buy two policies, one for the Trust, with a $1.5 million death benefit, and a second, with a $1 million death benefit for the Associated to endow a charitable fund. After Cooper told Steinhardt and Fish of his decision, he was informed that, in the interim, the premiums had increased. The $1 million policy would cost $10,700 a year for ten years, and the $1.5 million would cost $16,000 a year for ten years. Because he was still satisfied with the revised prices, he advised the insurance agents to have the policies issued. Although not the owners of the policies, the Coopers still planned to pay all premiums through contributions to the Trust and to Associated.

In August 1990, the $1.5 million policy was delivered to Cooper. A policy summary on the cover page stated that "Premiums Payable as Specified or Until Death of Survivor." The cover page also notified the policyholder of his right to

cancel the policy within a ten-day "free-look" period. On the same page, the policyholder is advised: "READ THIS POLI-CY CAREFULLY." On the next page of the policy, the "Policy Specifications" page, under the heading "YEARS PAYABLE," appears the word "LIFE."

Attached inside the back cover of the policy was a disappearing premium illustration, consisting of eight pages, showing that the "Out of Pocket Outlay" would be $16,000 a year for ten years ("Illustration II"). On the first page, appearing next to the "Out of Pocket Outlay" column, Illustration II featured columns titled "Dividend End of Previous Year," "Paid–Up Additions Outlay," "Cost Term Rider," and "Total Plan Premium." These numbers differ for each year of the policy. Illustration II also cautioned at the bottom of each page showing premium projections: "This illustration is not complete without the accompanying Supplemental Footnote Page," and at the top, on the right side: "Dividends applied to purchase paid up additions." Unlike Illustration I, however, this Illustration included the full eight pages.

The fifth page provided important disclosures:

This illustration is not a contract. It is a projection of values based on a combination of guaranteed values and contingent values such as dividends. Dividends and dividend purchases are neither estimated or guaranteed but are based on current company experience. . . . The current dividend scale is interest-sensitive which means significant changes in interest rates may affect future dividends.

When asked at his deposition whether he "ma[de] any effort to locate the Supplemental Footnote Page," Cooper responded, "I probably did, but I don't remember it." Cooper asserts that, without altering these papers in any way, he stored them in his office safe until the litigation began.

The $1 million policy was delivered directly to Associated without ever being shown to Cooper, and he did not see it until the litigation began. Stapled to the back cover of the $1 million policy was a two-page illustration, dated June 29, 1990.

The Coopers assert that the assumptions underlying Berkshire's illustrations of the premiums that the Coopers would have to pay were inconsistent with Berkshire's own internal forecasts and estimates, and were based on abnormally high dividends that, to the defendants' knowledge, Berkshire could not sustain. If the illustration had been based on Berkshire's real investment earnings rate, the Coopers claim, it would have shown the "disappear year" to be later than the ten years represented to Cooper.

In 1996, the Coopers learned for the first time that they would have to pay premiums for many years longer than the insurance agents originally represented. Fish disclosed this to Cooper during presentation of a "Life Insurance Policy Reprojection" as part of a meeting that he scheduled to sell them additional financial products.

## Trial Court's Ruling

The trial court granted summary judgment on all counts of the amended complaint, stating that

[i]n addition to the briefs of all parties, this Court has read and considered the opinion of the Honorable Deborah K. Chasanow of the United States District Court for the District of Maryland in *Thelen v. Massachusetts Mutual Life Insurance Company,* [111 F.Supp.2d 688 (D.Md.2000) ][and two *nisi prius* opinions].

This [c]ourt agrees with both the federal and Maryland State *nisi prius* opinions stated above and the reasoning thrice articulated therein.

Although the trial court did not state reasons for its decision, we have gleaned those reasons by reviewing *Thelen* and the *nisi prius* decisions (which were included in the record extract). *Thelen* dismissed a complaint alleging misrepresentations in connection with the sale of a vanishing premium life insurance policy on statute of limitations grounds. *See Thelen,* 111 F.Supp.2d at 695. The *nisi prius* decisions, also involving vanishing premium policies, dismissed complaints on grounds of: (1) limitations, (2) lack of justifiable reliance for

fraud or negligent misrepresentation, and (3) the economic loss doctrine.

## DISCUSSION

### Choice Of Law

█ Berkshire is a corporation domiciled in Massachusetts. The Coopers live in Maryland, and Associated has its principal offices in Maryland. Although the Coopers alleged in their complaint that Massachusetts law "governs certain claims raised in this Complaint," no party argues on appeal that Massachusetts law governs any of the counts. In tort actions, courts apply choice of law principles of the forum state. The Court of Appeals recently restated the Maryland approach to choice of law problems in tort:

> Maryland adheres to the *lex loci delicti* rule in analyzing choice of law problems with respect to causes of action sounding in torts. *Lex loci delicti* dictates that "when an accident occurs in another state substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." ... As a general rule, the place of the tort is considered to be the place of injury.

> \* \* \*

> The place of injury is also referred to as the place where the last act required to complete the tort occurred. *See* RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 377 (stating that the "place of wrong is the state where the last event necessary to make an actor liable for an alleged tort takes place")[.]

*Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744–46, 752 A.2d 200 (2000)(case citations omitted).

█ The alleged tort injury here is Cooper's entry into a contract of insurance that required the Coopers or Associated to pay additional premiums in order to keep the life insurance in force. Although Berkshire is headquartered in Massachusetts, the alleged misrepresentations were made to Cooper in

Maryland, the policy was delivered to the Coopers in Maryland, and, because the Coopers live in Maryland, the injury occurred here. Accordingly, we will apply Maryland law to the tort claims. *See id. See also Force v. ITT Hartford Life & Annuity Ins. Co.,* 4 F.Supp.2d 843, 850 (D.Minn.1998)(applying Florida law when Florida residents purchased vanishing premium policy from insurance company doing business in Minnesota).

▪ ▆▆▆ We will also apply Maryland law to the contract claim. Maryland applies the substantive law of the place where the contract was made, under the doctrine of *lex loci contractus. See Commercial Union Ins. Co., v. Porter Hayden Co.,* 116 Md.App. 605, 672–73, 698 A.2d 1167, *cert. denied,* 348 Md. 205, 703 A.2d 147 (1997). A contract is made in the place where the last act occurs necessary under the rules of offer and acceptance to give the contract a binding effect. *See id.* at 673, 698 A.2d 1167. Typically, the "locus contractu of an insurance policy is the state in which the policy is delivered and the premiums are paid." *Aetna Cas. & Sur. Co. v. Souras,* 78 Md.App. 71, 77, 552 A.2d 908 (1989)(citing *Sun Ins. Office v. Mallick,* 160 Md. 71, 81, 153 A. 35 (1931)). *See also Mut. Life Ins. Co. v. Mullen,* 107 Md. 457, 463, 69 A. 385 (1908)("as the first premium on the policy was paid in this State, by a citizen of this State, and the policy delivered here, . . . it is a Maryland contract and . . . governed by Maryland laws").

▆▆ The statute of limitations defense, asserted as to all the counts, is governed by the law of the forum because it is procedural. *See Maltas v. Maltas,* 197 F.Supp.2d 409, 423 (D.Md.2002)("Maryland courts apply Maryland's statute of limitations to claims that arise under the substantive laws of other states"); *Chase Manhattan Bank v. CVE, Inc.,* 206 F.Supp.2d 900, 906 (M.D.Tenn.2002)("[l]imitations of actions are generally governed by the laws of the forum state").

## Standard Of Review

The principles governing appellate review of summary judgment are clear:

Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Our review of the grant of summary judgment requires us to determine whether a dispute of material fact exists, and whether the trial court was "legally correct." Facts necessary to the determination of a motion may be placed before the court by pleadings, affidavit, deposition, answers to interrogatories, admissions of facts, stipulations, and concessions. We will review the "same information from the record and [*286] decide the same issues of law as the trial court."

*Thacker v. City of Hyattsville*, 135 Md.App. 268, 285–86, 762 A.2d 172 (2000) (citations omitted). A court must be aware of important limitations on its role in deciding summary judgment:

"In resolving whether a material fact remains in dispute, the court must accord great deference to the party opposing summary judgment. Even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the trial court is obliged to make the inference in favor of the party opposing summary judgment. The court should never attempt to resolve issues of fact or of credibility of witnesses—these matters must be left for the jury."

*Id.* at 286, 762 A.2d 172 (citation omitted).

### Fraudulent And Negligent Misrepresentation

Because the issues raised by appellants require familiarity with the law of fraudulent misrepresentation and negligent misrepresentation, we start our analysis by reviewing the elements of each.

■ To sustain an action for fraudulent misrepresentation, the plaintiff must prove:

"(1) that the representation made is false; (2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was

made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage directly resulting from such fraudulent misrepresentation."

*Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982)(quoting *Gittings v. Von Dorn*, 136 Md. 10, 15–16, 109 A. 553 (1920)).

"Negligent misrepresentation is one variety of a negligence action." *Walpert, Smullian, & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655, 762 A.2d 582 (2000). " '[T]he action lies for negligent words, recovery being permitted where one relies on statements of another, negligently volunteering an erroneous opinion, intending that it be acted upon, and knowing that loss or injury are likely to follow if it is acted upon.' " *Id.* at 656, 762 A.2d 582 (quoting *Virginia Dare Stores, Inc. v. Schuman*, 175 Md. 287, 292, 1 A.2d 897 (1938)). The principal elements are:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has the knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence."

*Martens Chevrolet*, 292 Md. at 337, 439 A.2d 534 (quoting *Virginia Dare Stores*, 175 Md. at 291–92, 1 A.2d 897.)

Negligent misrepresentation is more difficult to discern than fraudulent misrepresentation, because it depends on

the existence of a duty owed by a defendant to the plaintiff. "Patently, the duty to furnish the correct information arises when the relationship is of the nature that one party has the right to rely upon the other for information. The precise degree of the relationship that must exist before recovery will be allowed is a question that defies generalization." *Giant Food, Inc. v. Ice King, Inc.*, 74 Md.App. 183, 189, 536 A.2d 1182, *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988). "[T]he most common example of the duty to speak with reasonable care is based on a business or professional relationship, or one in which there is a pecuniary interest." *Id.* at 190, 536 A.2d 1182 (citing *Prosser & Keeton on the Law of Torts* § 107, at 105 (5th ed. 1984, 1988 Supp.)). *See also Griesi v. Atlantic Gen. Hosp. Corp.*, 360 Md. 1, 11, 756 A.2d 548 (2000)(quoting *Giant Food*). An estimate as to future facts by one knowledgeable in a particular field may be the basis of a cause of action for negligent misrepresentation. *See Ward Dev. Co. v. Ingrao*, 63 Md.App. 645, 655–56, 493 A.2d 421 (1985).

## I.

## Reasonable Reliance

Common to the torts of both fraudulent misrepresentation and negligent misrepresentation is the requirement that the plaintiff justifiably rely on the misrepresentation. *See Martens Chevrolet*, 292 Md. at 333–37, 439 A.2d 534; *Maryland Civil Pattern Jury Instructions* (3d ed. 2001) 11:1, 19.6. We shall address the justifiable reliance element of the Coopers' misrepresentation claims, first against Berkshire, and then against Fish and Steinhardt.

## A.

## Claims Against Berkshire

With respect to Berkshire, we shall address the alleged misrepresentation that the premiums were guaranteed separately from other types of alleged misrepresentations.

1.

## Misrepresentation That Premiums
## Would End After Ten Years

All three of the defendants argued below, and the trial court apparently agreed, that Cooper's reliance on the agents' representations that the premiums were guaranteed was not justifiable because the policies clearly stated that they were not guaranteed. The Coopers argue that there was a question of fact as to whether the Berkshire policies, with Illustration II attached, were so clear that Cooper could not justifiably have believed that his premium obligations would cease after ten years.

The defendants cite *Twelve Knotts Ltd. P'ship v. Fireman's Fund Ins. Co.*, 87 Md.App. 88, 589 A.2d 105 (1991), for the proposition that "a policyholder is not justified in relying on prior misrepresentations not incorporated in the written insurance contract where language that is contained in the written contract itself bears on the same subject matter." In *Twelve Knotts*, a real estate partnership solicited from several brokers a bid on a property and liability insurance policy. It received several bids, but found the policy offered by the defendant insurance company to provide the highest coverage at the lowest cost. Further, the defendant broker advised the plaintiff that premiums under the policy would be guaranteed for three years. After the partnership chose that policy, the defendant insurer issued a binder that said nothing about whether the quoted rate was guaranteed. The binder stated that the insurance was " 'subject to the terms, conditions and limitations of the policy(ies) in current use by the Company.' " *Id.* at 94, 589 A.2d 105. The permanent policy, issued a month later, stated in its first part:

> "If this policy is issued for a period of three years *and premium is not paid in advance,* the premiums due for each annual period of this policy shall be computed in accordance with the Companies [sic] ... premiums ... in effect (a) on the inception date of each annual period for

annualized policies, or (b) on the inception date of the policy for non-annualized policies."

*Id.* at 95, 589 A.2d 105 (emphasis in original). The policy also had an integration cause providing that it " 'embodies all agreements existing between [the insured] and the Company or any of its agents relating to the insurance.' " *Id.*

When the defendant broker sent the policy to the partnership, he did not mention in his cover letter that the policy stated that there was no rate guarantee. The partnership's director read only the cover letter and the initial page, and did not read the policy. After the first year, the insurer raised the rate for the coverage. As a result of the increase in premiums, the partnership filed suit alleging, *inter alia,* breach of contract, fraud, and negligent misrepresentation.

The trial court granted judgment in favor of both defendants at the end of the partnership's case. We affirmed that judgment, and in the course of ruling on the contract count,[1] followed an extra-jurisdictional body of cases requiring an insured to read its insurance policies:

> There is ... a body of cases ... to [the] effect, that an insured has a right to assume that the policy issued was based on the application and the failure of the insured to read the policy does not excuse the insurer. *See,* in general,

---

1. The defendants wisely do not cite *Twelve Knotts* for the following language, which we articulated in ruling on the negligent misrepresentation count:

 The brokers said that they could produce such a policy and actually ordered one. There was no evidence that, when they made that statement, such a policy could not or would not be produced; nor did they ever represent to appellant, negligently or otherwise, that the policy actually written had the promised feature in it. The sin, as we have said, was one of passive omission—of the insurers not informing the brokers that the feature they ordered was not in the policy and of the brokers failing to give like information to appellant.

 *Twelve Knotts Ltd. P'ship v. Fireman's Fund Ins. Co.,* 87 Md.App. 88, 101–02, 589 A.2d 105 (1991). We think that this rejection of a claim against an agent for failure to notify the insured that he could not obtain a policy the agent undertook to obtain, is inconsistent with the Court of Appeals' decision in *Popham v. State Farm Mut. Ins. Co.,* 333 Md. 136, 634 A.2d 28 (1993). *See infra,* section I.A., n. 6.

12 J. Appleman, *Insurance Law and Practice* § 7155. That is not a universal rule, however, or even a majority one, and it does not appear to have been adopted in Maryland. Indeed, ... [the] recent case of *Shepard v. Keystone Ins. Co.*, 743 F.Supp. 429 (D.Md.1990) [took a contrary approach.] . [There,] [t]he Court concluded that:

'It is the obligation of the insured to read and understand the terms of his insurance policy, unless the policy is so constructed that a reasonable man would not attempt to read it.... If the terms of the policy are inconsistent with his desires, he is required to notify the insurer of the inconsistency and of his refusal to accept the condition.'

Although, to our knowledge, there are no Maryland cases compelling this result, ... it appears to be the general rule.... We believe this to be a reasonable rule, and we therefore adopt it.

*Id.* at 105, 589 A.2d 105 (citations omitted). We agree with the defendants in this case that *Twelve Knotts* governs the Coopers' claims against Berkshire based on the oral representations that the ten year premium schedule was guaranteed. We explain.

On the first page of the $1.5 million policy, under the heading "Policy Summary" in bold print, the policy says: "Survivorship Life Policy;" and then "Premiums Payable as Specified or Until Death of Survivor." Without reading further, this page could suggest that "as specified" referred to the ten-year payment schedule shown in Illustration II. On the second page of the policy, however, appears "Policy Specifications," and there are two columns. One column is titled "Annual Premiums," and under that appears the numerical figure "$12,962.50." The other column is titled "Years Payable," and under that, the policy says "Life." This certainly appears to suggest premiums for life.

The Coopers argue, and we agree, that Illustration II could be viewed by a reasonable person as part of the policy. The policy delivered to Cooper specifies that "[t]he policy, the attached application, and any other attached agreements make

up the entire contract." Because, as Cooper says in his affidavit, Illustration II was attached to the back cover of his policy, he would be reasonable in believing that Illustration II was part of his contract of insurance. Illustration II contains a schedule showing the "Out of Pocket Outlay" to be $16,000 per year for 10 years. But other columns on that page show the component parts that add up to the $16,000, include payment for "paid-up additions." For the first twenty years, these columns appear as follows:

| YEAR | AGE | OUT OF POCKET OUTLAY | DIVIDEND END OF PREVIOUS YEAR | BASE POLICY PREMIUM | PAID-UP ADDITIONS OUTLAY | COST TERM RIDER | TOTAL PLAN PREMIUM |
|------|-----|------|------|------|------|------|------|
| 1 | 55 | 16,000 | 0 | 12,962 | 2,897 | 140 | 16,000 |
| 2 | 56 | 16,000 | 119 | 12,962 | 2,965 | 192 | 16,119 |
| 3 | 57 | 16,000 | 557 | 12,962 | 3,356 | 239 | 16,557 |
| 4 | 58 | 16,000 | 1,324 | 12,962 | 4,078 | 284 | 17,324 |
| 5 | 59 | 16,000 | 2,144 | 12,962 | 4,857 | 325 | 18,144 |
| 6 | 60 | 16,000 | 3,037 | 12,962 | 5,751 | 323 | 19,037 |
| 7 | 61 | 16,000 | 4,089 | 12,962 | 6,769 | 358 | 20,089 |
| 8 | 62 | 16,000 | 5,296 | 12,962 | 7,933 | 401 | 21,296 |
| 9 | 63 | 16,000 | 6,663 | 12,962 | 9,245 | 456 | 22,663 |
| 10 | 64 | 16,000 | 8,255 | 12,962 | 10,774 | 519 | 24,255 |
| 11 | 65 | 0 | 10,065 | 12,962 | -3,545 | 647 | 10,065 |
| 12 | 66 | 0 | 11,303 | 12,962 | -2,808 | 1,148 | 11,303 |
| 13 | 67 | 0 | 12,660 | 12,962 | -1,958 | 1,655 | 12,660 |
| 14 | 68 | 0 | 14,160 | 12,962 | -962 | 2,160 | 14,160 |
| 15 | 69 | 0 | 15,751 | 12,962 | 132 | 2,657 | 15,751 |
| 16 | 70 | 0 | 17,460 | 12,962 | 1,358 | 3,140 | 17,460 |
| 17 | 71 | 0 | 18,970 | 12,962 | 2,402 | 3,606 | 18,970 |
| 18 | 72 | 0 | 20,835 | 12,962 | 3,827 | 4,046 | 20,835 |
| 19 | 73 | 0 | 22,845 | 12,962 | 5,432 | 4,452 | 22,845 |
| 20 | 74 | 0 | 25,025 | 12,962 | 7,248 | 4,815 | 25,025 |

The above excerpt from Illustration II readily shows that in the first ten years, the "paid-up additions," as well as policy dividends, accrue because the $16,000 premium outlay exceeds the "base policy premium" of $12,962. The "paid-up additions" and dividends are then applied to pay the base policy premium in all years after the tenth year. Not only is this payment plan evident from the columns, but Illustration II explicitly explains, at the top of each page except page 7, "Dividends applied to purchase paid up additions."

Other pages of Illustration II clarify that the dividends are not guaranteed. On page 5, Illustration II says:

This illustration is not a contract. It is a projection of values based on a combination of guaranteed values and **contingent values such as dividends. Dividends and dividend purchases are neither estimated or guaranteed but are based on current company experience**....The current dividend scale is interest-sensitive which means significant changes in interest rates may affect future dividends. (Emphasis added.)

Although Cooper says that he did not understand in 1990 that the illustration was "a projection of values based on a combination of guaranteed values and contingent values such as dividends," we conclude that he would not be reasonable in holding that belief if he had read Illustration II. *Twelve Knotts* teaches us that, in the context of an action against Berkshire, Cooper was obligated to read the policy. *See Twelve Knotts,* 87 Md.App. at 105, 589 A.2d 105; *Thelen* 111 F.Supp.2d at 693–95 (applying statute of limitations to vanishing premium claims against insurance company as a matter of law because policies were clear that premiums were not guaranteed); *In Re: Northwestern Mutual Life Ins. Co. Sales Practices Litigation,* 70 F.Supp.2d 466, 488 (D.N.J.1999)(in action against insurance company, insured cannot rely on oral statements regarding guarantee of vanishing premiums that contradicted the language of the policy). As the defendants here assert, "[a]n insured cannot ignore conflicting or qualifying language in a policy or illustration and thereby 'close[ ] his eyes to avoid discovery of the truth' " (quoting *Northwestern Mut. Life. Ins.,* 70 F.Supp.2d at 492).[2]

---

**2.** We conclude above that *Twelve Knotts* bars the imposition of liability upon Berkshire because the policy clearly states that the dividends would vary, and thus the projections could not be relied upon to restrict the premium outlay to the first ten years. In reaching that conclusion, we analyze the Coopers' direct action against Berkshire, without benefit of a *respondeat superior* theory. The Coopers also allege, however, that Fish and Steinhardt were agents of Berkshire, as well as agents for them.

Under some circumstances, insurance companies are liable for the negligence of their agents. *See Popham,* 333 Md. at 156–57, 634 A.2d 28 ("[S]ince [insurance agent] is a captive agent for State Farm, ... he

The Coopers argue that because Associated only received the first two pages of Illustration II with its $1 million policy, Cooper was not on notice that the premiums could vary as to that policy. We do not find this argument persuasive. Cooper selected the two policies together, and had no reason to assume that the $1 million policy selected for Associated had guaranteed premiums when the $1.5 million policy for the Trust did not.

### 2.

### The Financial Assumptions Underlying The Projected Premiums

■ The *Twelve Knotts* rationale does not bar all of the Coopers' claims against Berkshire. The Coopers also allege in their complaint that Berkshire is liable for fraudulent and negligent misrepresentation because "the assumptions underlying Berkshire's illustrations were inconsistent with Berkshire's own internal forecasts, estimates, analyses and projections[.]" We conclude that this allegation, and similar ones, are sufficient to survive Berkshire's motion for summary judgment.

---

could bind State Farm and, so, his negligence is attributed to State Farm"). Under other circumstances, the insurance agent is considered to be the agent of the insured. *See Am. Cas. Co. v. Ricas*, 179 Md. 627, 631–32, 22 A.2d 484 (1941)(holding that the representations of an independent insurance agent did not bind the insurance company). The ultimate question of whether an agency has been created, one of intention, "is to be determined by the relations of the parties as they exist under their agreements, or acts." *Id.* at 631, 22 A.2d 484.

Berkshire, Fish, and Steinhardt submitted a joint brief to this court, and made their arguments without drawing any distinction between Berkshire, on the one hand, and Fish and Steinhardt, on the other. Nor did they address the question of whether Fish and Steinhardt were agents of Berkshire. Nor did the Coopers raise that issue on appeal. We will not delve further into the law as it relates to agency relationships between insurance agents or brokers and insurance companies. We only wish to make clear that our ruling here addresses only Berkshire's direct liability based on its relationship with the Coopers, not any potential liability under a *respondeat superior* theory based on Berkshire's relationship with Fish and Steinhardt.

This "inaccurate illustration" claim stands independently from the "guaranteed illustration" claim. Even though we have rejected the Coopers' claim against Berkshire based upon the representation that the ten year premium payment was guaranteed, the jury still could hold Berkshire liable if it found that the illustration materially understated the risk that the Coopers' premiums would not "disappear" in ten years, as the illustration depicted, and that the Coopers were induced to purchase the policy by the inaccurate information presented in the illustration.

The Coopers' amended complaint itemizes many specific non-disclosures that they contend induced them to purchase the policies based on the misleading illustration of a ten year "disappear date." According to Berkshire's standard language on page five of Illustration II, the illustration presented to the Coopers reflected its "current company experience." The Coopers assert that the illustration was an actionable misrepresentation because it did not accurately reflect the financial information regarding Berkshire's "current company experience" at the time the illustration was prepared for and presented to them. For example, they allege,

> Defendants failed to disclose to the Coopers . . . [that] the dividend scales used to illustrate the performance of Berkshire's policies included interest rate assumptions that were ***not supported by Berkshire's current investment results, lacked any reasonable basis in fact,*** and would decrease in future policy years . . . . Without disclosure of the foregoing material facts and information, the "disappearing premium" sales scheme was inherently false, misleading and deceptive. (Emphasis added.)

In support of this "inaccurate illustration" claim and in opposition to summary judgment, the Coopers submitted an affidavit from Philip J. Bieluch, an "expert in the field of life insurance and actuarial science." Bieluch opined that the ten year premium illustration was materially misleading at the time it was used to sell the policy to the Coopers because, contrary to Berkshire's claim on page five of Illustration II,

the illustration did not accurately reflect "current company experience."

> [Bieluch] would testify that when Defendants sold the policies to the Coopers in 1990, ***Berkshire should have known that the "disappear date" portrayed in its sales illustrations was false and that the actual "disappear date" would be later*** .... [B]ased ... on the information in ... the Complaint[,] ... Berkshire's Net Investment Yield during the five years before the Coopers purchased their policies (*i.e.*, 1985–89) had been less than Berkshire's Dividend Rate, and steadily declining. Thus, it was not realistically possible for Berkshire to continue paying dividends as represented in the illustrations while increasing their book of business. In short, Berkshire knew or should have known in 1990 that the Coopers would have to pay more premiums than illustrated.

Given these allegations and this evidence, we must assume for purposes of summary judgment that (1) the Coopers made their decision to purchase the policy on the basis of the illustration showing only ten years of premium payments; (2) the ten year premium period in the illustration was not based on accurate information about the company's "current" experience; (3) if the company had used its "current" experience at the time the policy was pitched to the Coopers, the premium period in the illustration would have been longer than ten years; and (4) the Coopers would not have purchased the policy if they understood that the prospect of a ten year "disappear date" was not based on current Berkshire experience or other reasonable factual basis.

In these circumstances, we conclude that a reasonable jury could find that the illustration constituted a materially misleading and inaccurate representation regarding the prospect of a ten year "disappear date" for the Coopers, and that the Coopers reasonably relied on that misleading illustration in deciding to purchase the Berkshire policy. We explain.

As the growing body of case law involving claims arising from "vanishing premium" life insurance policies reveals,

many courts have addressed similar allegations of misrepresented premium periods in illustrations used to sell "vanishing premium" insurance policies. Although each case varies in its particulars, there are common themes, including some apparent in this case. As the New York Court of Appeals observed in 1999, these cases "are not unique. They involve allegations and practices of a national scope that have generated industry-wide litigation." *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598, 602, 605–08 (1999)(rejecting fraud claim, but allowing claim pursuant to New York's consumer protection statute).[3]

One common element is that the disappearing premium illustrations were presented as having been "custom-made" for the insured. *See, e.g., id.* at 177, 725 N.E.2d at 600 ("as part of the company's standard marketing presentation, the agent prepared a personalized 'vanishing premium' illustration for each plaintiff"). Another common aspect in virtually all of these cases is that the illustrations show a "disappear date" that cannot reasonably be justified by the financial circumstances that existed at the time it was presented. *See, e.g., id.* ("the illustrations were premised on dividend projections that [the insurer] knew or should have known were untenable").

Courts have recognized the viability of claims based on analogous illustrations showing a "disappear date" that cannot reasonably be supported by the financial information that was available at the time the policy was sold. The rationale is that the illustration misrepresents a present, and not a future, fact, in that it purports to show that current financial information provides a reasonable factual basis for the projected "disappear date" in the illustration, and that the insurer and agent believe that the premiums are likely to "vanish" as stated in the illustration. *See, e.g., Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 515 (6th Cir.1999)(allegation that illustration for

---

**3.** The *Gaidon* Court noted that "25 States have adopted measures ... expressly aimed at combating alleged deception caused by 'vanishing premium' illustrations[.]" *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598, 606 n. 10 (1999) (citing statutes).

vanishing premium incorporated a presumed interest rate that was substantially higher than guaranteed rate and had not been attainable in recent years stated claim for fraud); *Grove v. Principal Mut. Life Ins. Co.,* 14 F.Supp.2d 1101, 1104, 1111 (S.D.Iowa 1998)(viable cause of action stated by claim that insurance company fraudulently concealed the presently known fact that the assumptions upon which the vanishing premium projections were based could not be supported by current experience); *Myers v. Guardian Life Ins. Co. of Am.,* 5 F.Supp.2d 423, 426, 430–31 (N.D.Miss.1998)(complaint sustained when plaintiff alleged insurer manipulated vanishing premium policy illustrations to artificially enhance the policy performance through unsupportable assumptions and actuarial devices); *Hignite v. Am. Gen. Life & Accident Ins. Co.,* 142 F.Supp.2d 785, 791–92 (N.D.Miss.2001)(allegations that illustrations for vanishing premium depended on abnormally high interest rates that did not represent the company's experience held to be representation of current fact); *Von Hoffmann v. Prudential Ins. Co. of Am.,* 202 F.Supp.2d 252, 259–60 (S.D.N.Y.2002)(allegations that insurance company and insurance agents failed to disclose that vanishing premium illustrations were based on an out-of-date method for crediting dividends "that likely predicted more optimistic results" stated action for fraud).

In this case, we conclude that a reasonable juror could find, based on the expert opinion proffered by the Coopers, that at the time they used the ten year premium illustration to make the sale to the Coopers, Berkshire knew that, given the company's "current ... experience," it was highly unlikely that the Coopers would have to make premium payments for only ten years. In that regard, the illustration ·could have been both a material misrepresentation of existing fact (*i.e.,* that the ten year premium period in the illustration was premised upon "current company experience"), and a materially misleading prediction (*i.e.,* that there was a reasonable prospect that the Coopers would have to pay premiums for only the ten year period in the illustration).

We do not view the fact that Cooper failed to read page five of Illustration II, stating that the illustration was based on "current company experience," before he accepted the policy as precluding a finding of actual or justifiable reliance. We acknowledge that if Cooper did not read this supplement, then he did not make his decision to purchase the policy based upon an explicit understanding that the illustration reflected "current company experience." But that does not change the result. In believing the ten year illustration to be guaranteed, Cooper could also implicitly believe that Berkshire offered the policy because the ten year projection had some reasonable basis in fact. If the jury concludes that Cooper reasonably understood the estimate or projection to be based on factual data available to Berkshire, and the numbers used in the projection do not accurately reflect Berkshire's financial data, then Cooper's reliance on the estimate or projection may constitute reliance on the financial misrepresentations.

For example, in *Von Hoffmann*, the insurer and broker used the insurer's favorable twenty year performance history to induce the insured to purchase a vanishing premium policy. At the time, however, they knew that Prudential had changed its methodology for crediting dividends, and therefore, that the performance information they had given to the insureds was misleading because the new methodology would generate far less favorable results in the future. In presenting an illustration showing an early "disappear date," the broker also "consistently omitted certain pages from the illustrations." *See Von Hoffmann*, 202 F.Supp.2d at 261. The court concluded that "[a]lthough the [insureds] cannot reasonably argue that they were defrauded into believing the premiums were sure to vanish in seven years or that the rates would not change, a reasonable jury could conclude that [the broker] committed fraud by omitting material information in an effort to induce the ... purchase[.]" *Id. See also Eisenberg v. Gagnon*, 766 F.2d 770, 779 (3d Cir.), *cert. denied sub nom., Wasserstrom v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (reading part of inaccurate projection was sufficient to support a finding of reliance); *Brug v. Enstar*

*Group, Inc.*, 755 F.Supp. 1247, 1252 (D.Del.1991)(projection may constitute actionable misrepresentation if it has no valid basis in fact); *In re Turkcell Iletisim Hizmetler, A.S. Securities Litig.*, 202 F.Supp.2d 8, 11–12 (S.D.N.Y.2001)(projection based on data that was inaccurate at time projection was made can be actionable misrepresentation); *Alexander v. Evans,* Fed. Sec. L. Rep. (CCH)¶ 97,795, 1993 WL 427409, *7, 1993 U.S. Dist. LEXIS 14560, *23 (S.D.N.Y.1993)(financial projections not genuinely believed by seller are basis for fraud). The prospective policy holder cannot be required to evaluate the facts underlying the company's estimate of a ten year premium payment period; nor can the insurer profit from its failure to present that information.

██ Although there are no "vanishing premium" cases reported by Maryland appellate courts, the legal principles supporting our conclusion are found in well-established Maryland law governing fraud and negligent misrepresentation claims. Maryland courts recognize that "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 239, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984)(adopting circuit court's opinion).

██ The same principle applies in an action for negligent misrepresentation. In a seller to buyer situation, like *Martens Chevrolet* and the present one, " '[l]iability . . . arises only where there is a duty, if one speaks at all to give the correct information.' " *Walpert, Smullian, & Blumenthal,* 361 Md. at 667, 762 A.2d 582 (quoting *Int'l Prods. Co. v. Erie R.R. Co.*, 244 N.Y. 331, 155 N.E. 662, 664, *cert. denied,* 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927)). The question of whether that duty exists

> "involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relation-

ship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another."

*Id.* (quoting *Int'l Prods. Co.,* 155 N.E. at 664). In determining whether the duty exists to support negligent misrepresentation, a significant factor is whether the promises were an inducement to the plaintiff and provided the defendant with a business advantage when the plaintiff acted in conformance with them. *See id.* at 672, 762 A.2d 582; *Village of Cross Keys, Inc. v. United States Gypsum Co.,* 315 Md. 741, 758, 556 A.2d 1126 (1989); *Jacques,* 307 Md. at 537–38, 515 A.2d 756. There is a "close interrelationship of the concepts of duty and reliance[.]" *Village of Cross Keys,* 315 Md. at 757, 556 A.2d 1126.

Applying the principles of these cases, we conclude that the purchase of a life insurance policy is a transaction in which the insurance company has a duty to be accurate in the information that it provides to the purchaser of the policy. Purchasing a life insurance policy is a significant investment, usually paid for over many years. Purchasers of life insurance rely on their policies for serious purposes—to give them security, support their family after the death of the insured, pay estate taxes, achieve savings through the augmenting of guaranteed cash values, provide security to the financing of major business transactions, and others. Further, life insurance, including the financing of its purchase, is a complex field, which even a businessperson, astute in another field, might not fully understand. *See Willis Corroon,* 369 Md. 724, 740–41, 802 A.2d 1050. This is especially so when the price of the policy—the premiums required—will depend upon the future earnings of the insurance company, and the dividends it pays. An insurance company that distributes information to agents or brokers, with the expectation that it will be used in selling

life insurance policies, must expect that the purchasers of those policies will rely on that information.

Although many of the negligent misrepresentation cases involve personal contact between the plaintiff and the defendant, *see, e.g., Griesi,* 360 Md. at 17, 756 A.2d 548 (pre-employment negotiations); *Weisman v. Connors,* 312 Md. 428, 448, 540 A.2d 783 (1988)(pre-employment negotiations); *Martens Chevrolet,* 292 Md. at 331–32, 439 A.2d 534 (negotiations to purchase automobile dealership); *Brack,* 230 Md. at 551–52, 187 A.2d 880 (advice from stock broker), personal contact is not always required. *See Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922). In *Glanzer,* a public weigher of beans, who was engaged and paid only by the seller, was held liable to the buyer of the beans for negligence in the weighing. In *Jacques* and *Walpert, Smullian, & Blumenthal,* the Court of Appeals quoted *Glanzer* with approval: "The buyer, although having no contract with the weigher, was the known and intended beneficiary of the contract between the seller and the weigher, and therefore a beneficiary of the duty owed by the weigher." *Id.* at 276; *see Walpert, Smullian, & Blumenthal,* 361 Md. at 658–59, 762 A.2d 582; *Jacques,* 307 Md. at 535–36, 515 A.2d 756.

The Court of Appeals suggested limitations on liability without personal contact when, in *Jacques* and *Walpert, Smullian, & Blumenthal,* it relied on *Ultramares Corp. v. Touche, Niven, & Co.* 255 N.Y. 170, 174 N.E. 441 (1931). Ultramares, a public accounting firm, was sued when it furnished to its client multiple copies of a negligently prepared balance sheet, expecting that the client would pass the balance sheet along to other businesses. "The accountant was aware, in other words, that the certified balance sheet would likely be used by the client to secure financing." *Walpert, Smullian, & Blumenthal,* 361 Md. at 659, 762 A.2d 582. In *Ultramares,* however, the New York Court of Appeals held that the accounting firm was not liable for negligent misrepresentation because there was no contractual relation between it and the other businesses. *See id.*

As the Court of Appeals recently reiterated in *Walpert, Smullian, & Blumenthal,* quoting its earlier opinion in *Jacques,* the teachings of *Glanzer* and *Ultramares* can be reconciled.

"We discern from our review of the development of the law of tort duty that an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. . . . Therefore, if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent."

*Walpert, Smullian, & Blumenthal,* 361 Md. at 659–60, 762 A.2d 582 (quoting *Jacques,* 307 Md. at 537, 515 A.2d 756).

Here, Cooper had direct personal dealings with the insurance agents and submitted an application for insurance providing personal information about himself and his wife to Berkshire. Illustration I and Illustration II allegedly were prepared by Berkshire with the intention that they would be used by insurance agents to sell its life insurance policies. Thus, unlike *Ultramares,* Berkshire knew that the Coopers had received Illustrations I and II, and were relying on them.

 Even if the illustration presented "only" an estimate of future premium payments, that would not put it beyond the reach of Maryland tort law. Although, as a general rule, predictive statements of future events are not actionable as fraud or negligent misrepresentation, we have

recognize[d] the difference between a promise of future events and an estimate by one knowledgeable in a particular field. In the latter situation, *redress may be had for representations as to future facts and not merely as to past or existing facts.* As stated by the commentators Fleming and Gray, . . . "[i]t is not surprising . . . that *courts have been increasingly willing to hold predictive statements material where the circumstances indicate to the*

> *addressee that the speaker has a factual basis for his predictions so that the existence of facts is implied by the representations."*

*Ward Dev. Co.*, 63 Md.App. at 656, 493 A.2d 421 (1985) (citations omitted and emphasis added).

In *Ward Dev. Co.*, we held that the question of whether the plaintiff home buyers could recover on a negligent misrepresentation claim against a developer and sales agent based on their inaccurate estimate of sewer and water charges was a matter for the jury.

> [T]he homeowners relied on Ward and its agents as knowledgeable in the field of real estate. Ward, as the developer of the subdivision, and Behrens, as the real estate selling agent, *held themselves out as knowledgeable in matters such as the charge for a sewer and water connection. The homeowners were entitled to rely on that estimate to a reasonable extent. But the charge stated in the contract was so far removed from the actual charge it cannot properly be termed a reasonable estimate and can only be explained as a misrepresentation.* Therefore, we hold that the estimate of the sewer and water connection charge was actionable under a theory of negligent misrepresentation. . . . [W]e find that the testimony and evidence presented, viewed in the light most favorable to the homeowners, generated a question of fact as to whether a case of negligent misrepresentation was made out against Ward.

*Id.* at 656–57, 493 A.2d 421.

Similarly, in *Miller v. Fairchild Indus., Inc.*, 97 Md.App. 324, 342–43, 629 A.2d 1293, *cert. denied*, 333 Md. 172, 634 A.2d 46 (1993), we recognized that a company's predictions regarding its future business operations may be actionable as fraud or negligent misrepresentation if, at the time they were made, the company knew that it would not or could not perform as predicted. In that case, we rejected a claim arising from a company's statements to employees that there would be enough work to keep its Hagerstown plant operating "well into the future." In doing so, however, we recognized that

"[t]he comments would be actionable ... if, at the time they were made, the speakers knew that the plant would be closed or that there would not be enough work to keep it afloat." *Id.* at 343, 629 A.2d 1293.

The principles in these Maryland cases instruct us that, in this case, Cooper was entitled to assume that the projections made by Berkshire were not pulled out of thin air, but rather had some basis in fact that made them realistic. We are persuaded that the Coopers can pursue their claim against Berkshire on this theory.

## B.

### Claims Against Fish And Steinhardt

Our delineation of which theories advanced by the Coopers would be successful against Berkshire centers around the *Twelve Knotts* holding that an insured cannot rely on representations made by an insurance agent in a suit against the insurance company when the policy contains clearly inconsistent terms. *Johnson & Higgins of Pa., Inc. v. Hale Shipping Corp.,* 121 Md.App. 426, 710 A.2d 318, *cert. denied,* 351 Md. 162, 717 A.2d 385 (1998); *CIGNA Prop. & Cas. Cos. v. Zeitler,* 126 Md.App. 444, 730 A.2d 248 (1999); and *Int'l Bhd. of Teamsters v. Willis Corroon* Corp. of Md., 369 Md. 724, 802 A.2d 1050 (2002), all decided after *Twelve Knotts,* make it clear that the *Twelve Knotts* rule does not always apply to claims in suits against insurance agents.

In *Johnson & Higgins,* Hale Shipping sued its insurance broker, alleging that it "failed to protect Hale Shipping's interests when it neglected to seek the deletion of a 'refrigeration clause' from a marine insurance policy that covered Hale's transportation of refrigerated cargo on one of its barges." *Johnson & Higgins,* 121 Md.App. at 430, 710 A.2d 318. When refrigerated cargo transported by Hale was damaged, the insurance carrier denied coverage because Hale had not obtained a survey by a disinterested and qualified surveyor certifying that the space, apparatus, and means used for refrigerated cargo was "in all respects fit." *See id.* at 433, 710

A.2d 318. Copies of the insurance policies, including this requirement, were sent to Hale Shipping, but Hale's operations manager did not notice the provision when skimming the policy.

Hale Shipping sued Johnson & Higgins, claiming that it had advised the broker that it could not have a refrigeration clause in its policy because it had no control over the crews of the ships that it chartered. Johnson & Higgins relied on *Twelve Knotts* in defense of this claim. We found *Twelve Knotts* distinguishable, however, because

Hale Shipping placed a much greater degree of justifiable reliance upon Johnson & Higgins than that placed upon Commercial Lines by the limited partnership in *Twelve Knotts*.... Hale Shipping conducted an active search for a reputable and knowledgeable maritime insurance broker on whose expertise it could rely to protect its interests as the corporation was entering a new field. Johnson & Higgins held itself out to possess such knowledge and expertise. [The broker's representative] testified that she knew that Hale Shipping was relying on her expertise when making its insurance decisions.... [She] testified that she had explained to the underwriter that Hale Shipping had no control over the crew of the chartered ship and that the survey requirement therefore was unreasonable. In addition, [a Hale Shipping representative] had frequent contacts with [the broker's representative] to discuss Hale Shipping's insurance needs. In contrast, in *Twelve Knotts*, the limited partnership solicited proposals and chose the insurance policy by merely accepting the lowest bid.

These distinguishing factors take the present case outside the rule adopted by this Court in *Twelve Knotts*. As a result, the trial court correctly concluded that Hale Shipping had not been contributorily negligent as a matter of law and that the breach of contract claim was not barred.

*Id.* at 441, 710 A.2d 318.

In *CIGNA Prop. & Cas.*, the plaintiff's yacht was damaged in a hurricane that stormed through the Caribbean island of

St. Maarten. Believing his yacht was covered by a marine insurance policy issued by Cigna Property and Casualty Companies ("Cigna"), and procured by Jack Martin & Associates, Inc. ("JMA"), an insurance agency located in Maryland, Zeitler presented a claim for his damages. When Cigna denied his claim because the insurance policy did not provide coverage in Caribbean waters after July 1, 1995, when the hurricane season commenced, Zeitler sued Cigna and JMA. In his claim against JMA, Zeitler alleged that he " 'relied upon the expertise, and advice of [JMA] to provide him with proper and adequate insurance coverage for his boat and to make sure the boat was insured for damage and/or destruction caused by natural disasters such as a hurricane, without limitation, as he had requested in his Renewal Application[.]' " *CIGNA Prop. & Cas.*, 126 Md.App. at 453, 730 A.2d 248. Zeitler claimed that JMA was negligent in " 'failing to procure the insurance coverage [Zeitler] requested' " and " 'not notifying [Zeitler] of any change in his renewal policy that reduced the benefits that had been available to [Zeitler] during the previous policy period.' " *Id.*

At trial, Zeitler testified that he did not read the insurance policy when he received it because " 'I sen[t] off my application, I was happy with what I asked to be insured for. And as long as nobody told me no, you cannot be insured for this, I was assuming that I was insured for what I applied for.' " *Id.* at 456, 730 A.2d 248. Appealing from a judgment entered after a jury verdict in favor of Zeitler, JMA, relying on *Twelve Knotts,* argued that it was entitled to judgment in its favor because Zeitler was contributorily negligent as a matter of law in not reading the policy, and because he accepted the terms of the modified contract.

We rejected this argument, finding that Zeitler's position was more like that of Hale Shipping in *Johnson & Higgins* than the insureds in *Twelve Knotts.*

> That Dr. Zeitler was a chief executive officer of a corporation, and had procured insurance for his boat in the past, does not undermine our conclusion.... By all indications, the policy appeared to be a "renewal." ... Indeed, consid-

ering JMA's repeated references to renewals, there would have been no reason for Dr. Zeitler to suspect the policy actually procured was anything other than a renewal. Even a "sophisticated" person with previous experience in purchasing insurance could have concluded that, absent notification to the contrary, the insurance requested on the application was the insurance that was obtained. Like the insured in *Johnson & Higgins*, [Zeitler] expected his broker to notify him if the new coverage was somehow different than the old.... Like *Johnson & Higgins*, we conclude that appellee "placed a much greater degree of justifiable reliance upon [JMA] than that placed upon Commercial Lines by the limited partnership in *Twelve Knotts*."

*Id.* at 489–90, 730 A.2d 248 (citation omitted).

Very recently, the Court of Appeals decided *Int'l Bhd. of Teamsters v. Willis Corroon Corp. of Md.*, 369 Md. 724, 802 A.2d 1050 (2002), in which the International Brotherhood of Teamsters ("the Teamsters") sued its insurance agent for failing to provide the insurance it requested. The Teamsters sought a policy that would bond it against loss by reason of fraud or dishonesty on the part of its officers and that would comply with a federal labor statute that required $500,000 per person coverage. The policy that was actually issued limited the insurer's liability to $500,000 per loss, rather than $500,000 per person. During the policy period, two officials, acting in concert, misappropriated $906,000 of the Teamsters' funds, causing additional damages of $2 million.[4] The Teamsters first sued the insurance company, but faced with policy language clearly limiting the company's liability to $500,000 for each loss, it released the insurance company, reserving any claim it had against the insurance broker.

The Teamsters next sued its broker, Willis Corroon, alleging that it "held itself out to [the Teamsters] as possessing special expertise, knowledge, and skill," and that the Teamsters had relied on Willis Corroon to procure a policy that

---

4. The extra damages were the costs of conducting a new election necessitated by the officers' removal.

would comply with federal bonding requirements. Willis Corroon relied on *Twelve Knotts*, and the circuit court credited that defense, finding the Teamsters contributorily negligent as a matter of law. On appeal, the Court of Appeals reversed, distinguishing *Twelve Knotts* on grounds that "there was no indication in *Twelve Knotts* that the insured relied on any particular expertise of the broker to produce a policy with certain specific terms." *Id.*, 369 Md. 724, 733, 802 A.2d 1050. It further distinguished *Twelve Knotts*, on the ground that the policy defect in that case was "readily apparent," and did not require the insured to read the entire policy or to "fathom complex or technical provisions." *Id.*, 369 Md. 724, 733, 802 A.2d 1050.

After reviewing *Johnson & Higgins* and other cases, the Court, relying on several treatises, pronounced a general rule in actions against an insurance broker or agent, regarding a policy holder's duty to read the policy.

> It is generally accepted ... that, when an insurance broker is employed to obtain a policy that covers certain risks and the broker fails (1) to obtain a policy that covers those risks and (2) to inform the employer that the policy does not cover the risks sought to be covered, an action may lie against the broker, either in contract or in tort.... The alleged duty to read the policy ... lies at the heart of the contributory negligence defense asserted to a claim of negligence on the part of the broker.... A fair reading of the cases and the more recent commentary as to negligence actions suggests that the duty is not necessarily to read the policy but simply to act reasonably under the circumstances. In some settings, acting reasonably may well require the insured to check parts of the policy or accompanying documents; in many settings, it will not. The duty to check the policy is essentially the flip side of the extent to which the insured reasonably may rely on the agent, broker, or insurer's having produced the terms and coverages for which the insured bargained or applied.

*Id.*, 369 Md. 724, 737–39, 802 A.2d 1050. Significantly, the Court reversed the summary judgment granted by the trial

court because the issue of whether the insured acted reasonably under the circumstances was for the trier of fact to determine.

> Because the issue in a negligence action is the reasonableness of the insured's conduct, it normally will be fact-specific and therefore, where there is any genuine dispute of relevant fact, for the trier of fact to determine. Relevant considerations would include whether the policy was a new one or a renewal, how much reliance was justifiably placed in the agent or broker by the insured, the nature of any past dealings between the insured and the broker, agent, or insurer, what information the insured was given about the policy, how difficult it would have been for the insured to learn of and appreciate any discrepancy, and whether any conduct on the part of the broker, agent, or insurer reasonably served to preclude an investigation by the insured.

*Id.*, 369 Md. 724, 740, 802 A.2d 1050.

*Johnson & Higgins, CIGNA Prop. & Cas.,* and *Willis Corroon,* rather than *Twelve Knotts,* control our determination of whether Cooper could have reasonably relied on the representations of Fish and Steinhardt. The Coopers alleged that these agents "cultivated a relationship of trust and confidence in the Coopers through their self-proclaimed expertise," and "held themselves out as highly-skilled insurance experts, possessing the special knowledge and expertise needed to interpret and understand the complex and sophisticated funding methods and mechanics of the disappearing premium policies." The Coopers also alleged that these agents were social friends prior to their business relationship. Cooper stated in his affidavit that he chose Fish and Steinhardt because he wanted them, as friends, to benefit from the commissions that would be generated from his purchase of the two policies.

 These averments, if proven, are sufficient to support a finding that Cooper reasonably expected the insurance agents to notify him if the delivered policy was somehow different from the discussed policy. The question of whether Cooper did reasonably rely on Fish or Steinhardt under these circum-

stances is, like the question of contributory negligence,[5] a question of fact that defeats summary judgment. *See id.*, 369 Md. 724, 740–41, 802 A.2d 1050 (reasonableness of insured's conduct in failing to read policy is fact question). *See also Benjamin v. Erk*, 138 Md.App. 459, 482, 771 A.2d 1106, *cert. denied*, 364 Md. 461, 773 A.2d 513 (2001)(whether plaintiff reasonably relied is a question of fact because it depends on why he did not read the documents he signed); *CIGNA Prop. & Cas.*, 126 Md.App. at 491, 730 A.2d 248 (upholding jury verdict in favor of insured against insurance broker despite failure to read policy); *Johnson & Higgins* 121 Md.App. at 441, 710 A.2d 318 (upholding jury verdict for insured against insurance broker despite failure to read policy).

Fish and Steinhardt also assert that Cooper's reliance cannot be reasonable in light of his acknowledgment during questioning by defense counsel that the "deal" was "too good to be true." We view this argument as raising a question of fact, as well. This acknowledgment must be interpreted by the jury. The jury might interpret it as an indication that Cooper knew the policy projections were commercially unreasonable, and therefore did not reasonably rely. Alternatively, the jury might view it as an indication that he thought the policy was a good investment. We cannot say as a matter of law that a decision to purchase life insurance because it is a good investment is an unreasonable act.

## II.

### The Economic Loss Doctrine

The Coopers also challenge the trial court's application of the economic loss doctrine, a rule of law restricting tort theories of recovery in situations involving economic loss when

---

**5.** We note that *Twelve Knotts, Johnson & Higgins, CIGNA Prop. & Cas.*, and *Willis Corroon* addressed the defense of contributory negligence, rather than the defense offered in this case—failure to establish the element of reasonable reliance. The two defenses are similar, however, in that both rely on the insured's reasonableness *vel non* in failing to read the policy.

there exists no independent duty. The Court of Appeals has described the economic loss doctrine as follows:

> As a general rule, when the failure to exercise due care creates a risk of economic loss only, and not the risk of personal injury, we have required an "intimate nexus" between the parties as a condition to the imposition of tort liability. That "intimate nexus" may be satisfied by contractual privity, ... "or its equivalent." One "equivalent" is stated in § 552 of the RESTATEMENT (SECOND) OF TORTS (1965), which, in relevant part, provides that (1) a person who, in the course of its business, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on that information, if the person fails to exercise reasonable care or competence in obtaining or communicating the information[.] ... Those principles have been adopted by this Court and are a part of the Maryland law.

*Swinson v. Lords Landing Village Condo.*, 360 Md. 462, 477–78, 758 A.2d 1008 (2000) (citations omitted). *Accord Griesi,* 360 Md. at 17, 756 A.2d 548.

▆▆▆▆ As we have discussed, a defendant's representation may be negligent if the defendant, owing a duty, failed to make statements needed to clarify the plaintiff's understanding. *See id.* The Court of Appeals first considered whether a party could recover for economic loss only under a negligent misrepresentation theory in *Brack v. Evans,* 230 Md. 548, 187 A.2d 880 (1963). There, the Court held that a stock brokerage firm who "held themselves out as consultants and experts in the field of securities" was liable for negligence in recommending that the plaintiff buy stock. *See id.* at 551, 187 A.2d 880. In another seminal case, *Martens Chevrolet,* the Court of Appeals held that the seller of an automobile dealership could be liable for negligent misrepresentation for telling the prospective buyer that the business was "mildly profitable," and that the audited financial statements were not completed, when, in fact, the audited statements were complete and

showed a loss. *See Martens Chevrolet,* 292 Md. at 332, 439 A.2d 534.

In defense of the trial courts ruling, all three defendants argue that

> Maryland has recognized tort claims for purely economic losses only in two narrow circumstances: (1) where such loss is "coupled with a *serious* loss of death or personal injury resulting from a dangerous condition," ... and (2) where the tort concerns "a duty or obligation imposed by law independent of that arising out of the contract itself." Because the case at bar does not present a risk of death or serious physical injury, and because Appellees have no obligation independent of the policies, Appellants cannot maintain their tort claims. (Citations omitted).

As we understand the defendants' argument, they fundamentally assert that they had no duty to the Coopers under these circumstances. We disagree, for the reasons set forth below.

### A.

### Fish And Steinhardt

With respect to Fish and Steinhardt, we easily can answer this argument because insurance agents and brokers clearly owe a professional's duty to the insured.

> "An agent, employed to effect insurance, must exercise such reasonable skill and ordinary diligence as may fairly be expected from a person in his profession or situation, in doing what is necessary to effect a policy, in seeing that it effectually covers the property to be insured, in selecting the insurer and so on."

*Lowitt & Harry Cohen Ins. Agency, Inc. v. Pearsall Chem. Corp. of Md.,* 242 Md. 245, 254, 219 A.2d 67 (1966)(quoting *Couch Insurance* 2d § 25:37).[6] The failure to meet that duty allows a recovery in tort.

---

**6.** The duty of an insurance agent does not extend to the obligation to advise the purchaser regarding the adequacy of the level of coverage on her liability insurance, in the absence of a special relationship or a

It is generally accepted ... that, when an insurance broker is employed to obtain a policy that covers certain risks and the broker fails (1) to obtain a policy that covers those risks, and (2) to inform the employer that the policy does not cover the risks sought to be covered, an action may lie against the broker, either in contract or in tort.

*Willis Corroon*, 369 Md. 724, 737, 802 A.2d 1050. The existence of this independent duty means that insurance agents and brokers fall within the second category acknowledged by the defendants as constituting an exception to the economic loss rule.

## B.

### Berkshire

We hasten to add that this duty of professional insurance agents and brokers does not apply to Berkshire except on a *respondeat superior* theory of recovery. *See infra* n. 6. The Coopers' cause of action against Berkshire rests, however, not on a general duty of care, but on the narrower duty to convey accurate information to a person with whom one enters a business transaction. We are concerned here only with whether there was a duty to support negligent misrepresentation, which is "one variety of a negligence action." *Walpert, Smullian, & Blumenthal*, 361 Md. at 655, 762 A.2d 582.

The Coopers rely in part on *Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986), which Berkshire distinguishes. Although it is not a negligent misrepresentation case, *Jacques* is instructive on the general topic of the economic loss doctrine. In that case, a bank was held liable for negligently processing the Jacques' loan application. The Court of Appeals concluded that the bank had a duty that supported the negligence claim, even though there was only

---

request to do so. *See Sadler v. The Loomis Co.*, 139 Md.App. 374, 410, 776 A.2d 25 (2001). If the agent elects to give such advice, however, it has an obligation to exercise due care in doing so.

economic loss involved, for several reasons. First, for consideration, the bank made two express promises to the Jacques: one to process their loan application, and another, to lock in the interest rate for 90 days. *See id.* at 537, 515 A.2d 756. Second, the agreement "to process the loan application was intended to and did result in a business advantage to the bank." *Id.* at 537–38, 515 A.2d 756. Third, the bank expressly undertook to process the application, which implied that it would do with reasonable care. *See id.* at 540, 515 A.2d 756. Fourth, under the provisions of their contract to purchase a residence, the Jacques were "particularly vulnerable and dependent upon the Bank's exercise of due care," because they might lose their deposit or the benefit of their bargain. *See id.* at 540–41, 515 A.2d 756. Fifth, "[t]he banking business is affected with the public interest." *Id.* at 542, 515 A.2d 756.

■■■ We do not need to decide whether an insurance company selling life insurance owes a general tort duty to the people to whom it issues policies of insurance.[7] The Coopers' claim for negligent misrepresentation is more limited than the duty recognized in *Jacques*, because it rests on an implied representation made by Berkshire to its insured—that the proffered ten year premium schedule rested on the actual "current company experience" of Berkshire or that it had other reasonable basis in fact. Thus, we do not need to address Berkshire's argument that

> [i]nsurance companies do not fit any category of business upon which Maryland law imposes a tort duty of care in contractual dealings. *Jacques* identified "professionals such as physicians, attorneys, architects, and public accountants" as belong to this group, as well as "those occupations requiring peculiar skill."

*Id.* at 541, 515 A.2d 756. As we previously have explained in Section I.A.2 Berkshire had an independent duty not to be false or misleading in the representations that it made about

---

7. We are not asked, for example, to hold that Berkshire had a duty to use reasonable care in deciding whether the Coopers qualified for life insurance.

the policies that it offered. Further, a contract was entered into between Berkshire and the Coopers, thus establishing the contractual privity that suffices as the intimate nexus required to avoid application of the economic loss doctrine.[8]

For these reasons, we are not persuaded that the economic loss doctrine bars the Coopers' claims against either Fish and Steinhardt, or against Berkshire.

## III.

### The Statute Of Limitations

A civil action at law must be filed within three years, measured "from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md.Code (1974, 1998 Repl.Vol.) § 5–101 of the Courts and Judicial Proceedings Article. This general rule is qualified by the "discovery rule," providing that the cause of action accrues when the claimant knew or reasonably should have known of the wrong. *See Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677 (1981). The discovery rule

> contemplates ... awareness implied from "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued."

---

**8.** Berkshire cites *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.,* 991 F.2d 94, 98 (4th Cir.1992) in support of its economic loss argument. In that case, the Fourth Circuit affirmed dismissal of a negligent misrepresentation claim under Maryland law because circumstances did not warrant the imposition of an extra-contractual duty to exercise reasonable care in making representations. *Martin Marietta* distinguished *Weisman v. Connors* on the ground that it "only involved pre-contractual representations." *Id.* at 99. This case is distinguishable on the same ground, in that Illustration I was pre-contractual.

Berkshire also relies on *Parkhill v. Minn. Mut. Life Ins. Co.,* 995 F.Supp. 983, 994–95 (D.Minn.1998), a case that we find inconsistent with Maryland law.

*Id.* at 637, 431 A.2d 677 (citation omitted). *Accord Frederick Rd. Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 95–96, 756 A.2d 963 (2000).

 Echoing themes from their argument on reasonable reliance, the defendants contend that the Coopers were on "inquiry notice" of their claims in 1990, because: (1) the sales illustration was "too good to be true;" (2) it would be unreasonable for anyone to expect that dividends would remain as illustrated, given inevitable changes in the economy; (3) there were no guarantees in the policies that premiums were due for only ten years; (4) the first page of the policies lists "life" under the heading "Years Payable;" (5) the bottom of the Illustration page specifies that "this illustration is not complete without the accompanying Supplemental Footnote Page;" and (6) the Supplemental Footnote Page, page five of Illustration II, enclosed with the $1.5 million policy, says: "This illustration is not a contract." We address these limitations arguments separately as to Berkshire, on the one hand, and Fish and Steinhardt, on the other.

As to Berkshire, because of our ruling in Section I.A.1 that the Coopers have no cause of action based on any guarantee that the premiums would stop after ten years, we need only consider whether limitations bars the "inaccurate illustration" claim that Berkshire negligently or fraudulently failed to use its "current company experience" or some other reasonable basis in fact as the basis for the premium projections used in both illustrations. There was nothing in either policy or in Illustration I or II that put Cooper on inquiry notice that the projections did not reflect either actual experience or some other reasonable basis in fact. Thus, the statute of limitations on an "inaccurate illustration" claim against Berkshire, or Fish and Steinhardt, would not begin to run until the Coopers were put on notice of their claim by some other method.

 The issue of limitations on the claims against Fish and Steinhardt on the theory that the premiums were guaranteed requires a different analysis because the $1.5 million policy, as delivered, indicated that the premiums were not

guaranteed. "The court has the exclusive power to determine the manner of operation of the discovery rule," but a trier of fact determines questions of fact on which a limitations defense turns. *See Pennwalt Corp. v. Nasios,* 314 Md. 433, 449–50, 550 A.2d 1155 (1988). *See also Frederick Rd.,* 360 Md. at 96, 756 A.2d 963 ("the question of notice generally requires the balancing of factual issues"). In some circumstances whether a reasonably prudent person should undertake a further investigation is a matter about which reasonable minds can differ, and is therefore a question of fact precluding summary judgment. *See Baysinger v. Schmid Prods. Co.,* 307 Md. 361, 367–68, 514 A.2d 1 (1986)("Whether a reasonably prudent person should [under the circumstances] have undertaken a further investigation is a matter about which reasonable minds could differ, and it was therefore inappropriate for resolution by summary judgment"). *Accord Pennwalt,* 314 Md. at 451, 550 A.2d 1155 (quoting *Baysinger*). We believe this is such a case. Fish and Steinhardt were friends of Cooper, and held themselves out as experts in the field of life insurance. Reasonable persons could differ as to whether a person of ordinary prudence in Cooper's position would have assumed upon receipt of the $1.5 million policy without contrary notification, that the policies that Fish and Steinhardt procured complied with the promises they made regarding premium payments.

The defendants and the trial court relied on the recent decision of the *United States District Court* for Maryland in *Thelen v. Mass. Mut. Life Ins. Co.,* 111 F.Supp.2d 688 (D.Md. 2000), and another federal case relied on by *Thelen, In re Northwestern Mut. Life Ins. Co. Sales Practices Litig.,* 70 F.Supp.2d 466 (D.N.J.1999). Both of these cases involved claims of misrepresentation arising from the purchase of vanishing premium life insurance policies. According to the federal court in *Thelen,* referring to the New Jersey decision, "[t]he [Northwestern Mut. Life Ins.] plaintiffs were found to have been put on notice by the policies themselves which contradicted or failed to incorporate the alleged representations of vanishing premiums upon which the plaintiffs relied." *Id.* at 692. The plaintiffs in this case differ from those in

*Northwestern Mut. Life Ins.* because none of those plaintiffs received with their policies an attached illustration that showed the ten year premium schedule.

More importantly, the claims in *Thelen* and *Northwestern Mut. Life Ins.* were claims against the insurance companies, not against the agents. As we previously have discussed, Maryland imposes a greater duty on insurance agents than on insurance companies. The heightened duty owed by insurance agents allows greater reliance by the insured, and creates a correspondingly lesser standard of vigilance in detecting that the issued policy did not live up to the agents' representations. Given this greater duty, and corresponding greater level of justifiable reliance, we cannot say that Cooper was unreasonable, as a matter of law, in not reading the policy in 1990 and detecting that it did not conform to Fish and Steinhardt's representations.

## Conclusion

For the reasons set forth above, we vacate the judgment of the trial court granting summary judgment in favor of the defendants, and remand for further proceedings consistent with this opinion. The Coopers' claims against Berkshire are limited to the "inaccurate illustration" claims, and shall not include their contention that the premium projections were guaranteed. The Coopers' claims against Fish and Steinhardt are not similarly limited. The statute of limitations defense will be decided by the trier of fact.[9]

---

9. The counts seeking imposition of a constructive trust, declaratory relief, and reformation were dependent on survival of the substantive counts for fraud, fraudulent concealment, negligent misrepresentation, breach of contract, and presumably, in the mind of the trial judge, fell with those counts. Because any defenses to these counts were not ruled on by the trial court, we shall not address defendants' arguments about them here. *See, e.g., Gresser v. Anne Arundel County*, 349 Md. 542, 552, 709 A.2d 740 (1998)("Maryland appellate courts will only consider the grounds upon which the lower court granted summary judgment"). Also, the only defense to the contract action apparently ruled on by the trial court was limitations, and we shall not address any other possible defenses to that count. Further, although defendants

JUDGMENT REVERSED IN PART, AND AFFIRMED IN PART. CASE REMANDED FOR FURTHER PRO-CEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ¼ BY APPELLANTS AND ¾ BY APPELLEES.

argue in their brief that the Massachusetts Consumer Protection Act count must fail because that Act does not apply, we do not address that issue because the trial court did not rule on it. Finally, we shall not address the defendants' argument that Associated is not a proper party to this suit, because the trial court did not rule upon it.